**IBERVILLE PARISH WATERWORKS DISTRICT NO. 3, on behalf of itself and others similarly situated, Plaintiffs**

v.

**NOVARTIS CROP PROTECTION, INC., Defendant.**

No. CIV. A. 97–0886–CB–M.

United States District Court, S.D. Alabama, Southern Division.

March 15, 1999.

Arthur N. Bagwell, White Castle, LA, Claude V. Bilbo, Jr., Pascagoula, MS,

Stanley Chesley, Louise Roselle, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, City of Bowling Gree, John C. Williams, Esq., Mobile, AL, David R. Donaldson, Pamela Beard Slate, Donaldson, Guin & Slate, L.L.C., Birmingham, AL, James R. Dugan, II, James R. Duncan, II, Gauthier, Murphy, La Barre, Beiser & Dean, Metarie, LA, Calvin C. Fayard, Jr., Fayard & Honeycutt, Denham Springs, LA, Wendell H. Gauthier, Gauthier & Downing, Metairie, LA, Lawrence G. Gettys, Plaquemine, LA, Charles A. Graddick, Graddick, Belser & Nabors, PC, Mobile, AL, Linda S. Hurang, Murray Law Firm, New Orleans, LA, Stephen M. Irving, Baton Rouge, LA, J. Chandler Loupe, Claitor & Loupe, LLC, Baton Rouge, LA, J. Greg Murphy, Claitor, Murphy & Loupe, Baton Rouge, LA, Stephen B. Murray, Sr., Murray Law Firm, New Orleans, LA, Pamela M. Pendley, Plaquemine, LA, Patrick W. Pendley, Plaquemine, LA, John C. Williams, Mobile, AL, for plaintiffs.

Henry Bernis Alsobrook, Jr., Paul Oneal Dicharry, Joseph P. Gordon, Jr., Mark Christopher Surprenant, Adams and Reese, New Orleans, LA, Deborah B. Hembree, Edward Josepoh Rice, Jr., Adams & Reese, Mobile, AL, Christopher Mahoney, Washington, DC, F. Grey Redditt, Jr., L. Thomas Styron, Vickers, Riis, Murray & Curran, L.L.C., Mobile, AL, for defendant.

Cinda Ruth York, Donaldson, Guin & Slate, L.L.C., Birmingham, AL, pro se.

### ORDER

BUTLER, Chief Judge.

This matter is before the Court on Defendant's Motion for Partial Summary Judgment (Doc. 82) in which Defendant argues that Plaintiffs have failed to meet the constitutional requirements which would establish standing to sue in this Court. Additionally, Defendant contends that, even if Plaintiffs do have standing, any claim they may have is not yet ripe for adjudication. Having carefully considered Defendant's Motion for Partial Summary Judgment, Plaintiffs' Opposition (Doc. 92) and Defendant's Reply (Doc. 100) and the briefs filed in support of each, the Court finds that there remains no genuine issue of material fact and that Defendant is entitled to judgment as a matter of law and therefore Defendant's Motion for Partial Summary Judgment is due to be granted. Because Summary Judgment has been granted on the threshold issues of standing and ripeness, the Court need not address the substantive grounds on which Plaintiffs' claims are based.

### PROCEDURAL HISTORY

The named Plaintiffs are local water systems in Iberville Parish, Louisiana and Bowling Green, Ohio and are thus citizens of those states. Novartis, as successor-in-interest to Ciba–Geigy Corporation, and is a citizen of some state other than Ohio or Louisiana and produces Atrazine at a manufacturing facility in McIntosh, Alabama. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, diversity of citizenship and an amount in controversy in excess of $75,-000.00 exclusive of interest and costs.

Plaintiffs brought this novel proposed class action on behalf of themselves and all similarly situated public and community water systems. They allege that, because of the requirements of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.* and the regulations promulgated thereunder by the Environmental Protection Agency, 40 CFR § 141 *et seq.*, the water systems have been, or will be, forced to expend considerable sums to remove Atrazine from their drinking water. Additionally, because of the SDWA and EPA regulations, Plaintiffs contend that they have been forced to test the raw water for the presence of Atrazine in order to determine whether to treat the raw water for that chemical. Plaintiffs' Second Amended Class Action Complaint (Doc. 95) contains six theories under which Novartis may be held liable for Plaintiffs' expected costs of testing for and removing Atrazine from

drinking water: Count I alleges strict products liability; Count II, negligence; Count III, strict liability for abnormally dangerous or ultra hazardous activity; Count IV, trespass; Count V, nuisance; and, Count VI, unjust enrichment.

## Standard for Summary Judgment.

Summary Judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

Once the moving party has satisfied its burden, then the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* If the nonmoving party fails to make "a sufficient showing on an essential element of its case with respect to which she has the burden of proof", the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Otherwise stated, the nonmovant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark*, 929 F.2d at 608. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party". *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202). Additionally, mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment. *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir.1989); *Jackson*

*v. City of Auburn*, 41 F.Supp.2d 1300, 1308 (M.D.Ala.1999).

In so doing, the nonmoving party may not rest on the pleadings alone. *Celotex* at 324, 106 S.Ct. 2548. Rather, the nonmoving party must designate "specific facts" and employ affidavits, or by the "depositions, answers to interrogatories, and admissions on file," show that there is a genuine issue for trial. *Id. and Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382 (11th Cir.1990); *Weiss v. School Board of Hillsborough County*, 141 F.3d 990, 994 (11th Cir.1998).

Still, the function of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." *Anderson v. Liberty Lobby, Inc.*, at 249, 106 S.Ct. 2505. The evidence must be viewed in a light most favorable to the nonmoving party and all inferences will be drawn in a nonmoving party's favor. *Id.* at 255, 106 S.Ct. 2505; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 157–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### FINDINGS OF FACT

#### Atrazine

Atrazine, whose chemical formula is 2–chloro4–ethylamino–6–isoproplyamino–s–triazine, is a herbicide which is used mainly by corn, sorghum, and sugar cane farmers for pre-emergence broad leaf weed control. Atrazine is advantageous to farmers because it does not readily bind to soil, it has limited solubility in water, and is not easily broken down by biological or photo-decomposition.[1] However, Atrazine has been identified as an environmental hazard by the Environmental Protection Agency, and public water systems are required to test their finished water at points where

---

1. See Montgomery–Watson Report to Mitchell Ourso, Doc. 93, Exhibit B, at 5. (Hereinafter cited as Montgomery–Watson Report)

the water enters the distribution system. 40 CFR § 141.24(h)(2). Both because of its potential for run-off and because the EPA found that Atrazine had an adverse affect on animals, EPA set a Maximum Contaminant Level ("MCL") of 0.0003 parts per million (or 3 parts per billion) on an average annualized basis. 40 CFR § 141.28. Drinking water that meets the EPA standard is associated with little or no potential health risk presented by Atrazine contamination. *Id.*

Conventional water treatment facilities have great difficulty in removing Atrazine from the water supply. While some systems are experimenting with oxidization techniques, the EPA has certified that the best available technology is a granular activated carbon ("GAC") filter system. 40 CFR § 141.61(b).[2] Though it is both more effective in removing Atrazine and is easier to use, a GAC filter system requires a substantial capital expenditure before it can be brought into operation. Montgomery–Watson Report at 5.

A far less expensive technique for removing Atrazine is to apply powdered activated carbon ("PAC") to the existing filtration system. PAC must be added to the raw water as a "slurry" and must be well-mixed with the water to allow it sufficient contact time to absorb contaminants. Then, as the water enters the existing filtration system, the filters remove the PAC and any contaminants that have been absorbed. If, however, the PAC slurry does not have sufficient contact time, it will be ineffective in removing Atrazine.

A third technique for removing Atrazine is to add makeshift GAC filters to the existing system and to use those along with PAC in order to increase overall contact time and enhance the system's ability to remove contaminants. As with PAC, however, if there is insufficient contact time, the improvised GAC filters will not be effective in removing Atrazine from the raw water.

## Iberville Parish Waterworks District No. 3

Iberville Parish Waterworks District No. 3 ("District 3") is a public body created by Iberville Parish in 1960. District 3 serves customers in western Iberville Parish. It draws its water from the Upper Terrebonne Basin watershed which lies west of the Mississippi River southwest of Baton Rouge, Louisiana, and is fed by the Lower Grand River, Bayou Grosse Tete, and Bayou Maringouin. Additionally, the watershed is traversed by the Intercoastal Waterway, which introduces some water from the Mississippi River into the watershed.

District 3 maintains a conventional treatment facility. Though District 3 does perform testing of the finished water as required by the SDWA and 40 CFR § 141.24(h)(2), it performs no Atrazine testing on its raw water. (Deposition of Brian Peek, 45:14–17, 77:22–23, Doc. 83, exhibit 12). Rather, Novartis and the State of Louisiana conduct and pay for raw-water Atrazine testing. *Id.* While District 3 has never been found to be in violation of the Atrazine MCL, during certain periods of the year, District 3 observes a spike in Atrazine levels which has raised some concern among the Board members.[3] In an effort to eliminate any

---

**2.** This Court takes particular note of the fact that GAC is deemed the best available technology for more than just Atrazine. The EPA lists 51 organic chemicals for which GAC is the best available technology. 40 CFR § 141.61(b). GAC is also listed as one of the best available technologies for removal of mercury. 40 CFR § 141.62(c). Were a public water system to install such a system in order to remove Atrazine, it would then receive the ancillary benefit of removing nearly all the organic contaminants identified by the EPA as harmful. Such a result calls the very premise of Plaintiffs' suit into question—why, after all, should Novartis bear the cost of removing contaminants for which it has no responsibility whatsoever?

**3.** See EPA Safe Drinking Water Information System ("SWDIS") report of Safe Drinking Water Violations for Iberville Waterworks Dist. # 3 (Doc. 100, exhibit 1); Public Statement of Waterworks District No. 3 (Doc. 83, exhibit 13); Report of Dr. William Hartley

potential Atrazine threat, District 3 has used PAC and makeshift GAC filters, but the results were not satisfactory to the Board (Statement of Waterworks Dist. No.3, Doc. 83, exhibit 13). The Board determined to obtain a GAC filtration system that would remove any and all Atrazine contaminants from the drinking water. *Id.*

For their part, Plaintiffs do not dispute that District 3 has never been cited by any governmental entity for violating the Atrazine M.C.L. § (see Doc. 93, Plaintiff's Response to Defendant's Determinations of Undisputed Fact). Rather, Plaintiffs rest only on the testimony of Junior Ory Aucoin, the District's Chairman. Mr. Aucoin, who testified that he was no chemist, relied in turn on the William Harley report on triazine levels in District 3. Additionally, Aucoin asserted that, in meetings with Louisiana regulatory officials, the District 3 Board received information that the District had "an Atrazine problem."

Mr. Aucoin's conclusions are unsupported by the evidence. It is clear from the Hartley report that the test results are for triazine, the chemical family which includes Atrazine, and that Atrazine levels would be considerably lower than the triazine levels measured. Hartley's report goes on to say that,

> there is no risk of systemic toxicity posed to either adults or children of the Iberville Parish Waterworks District # 3 area for this year. In addition, the cancer risk from exposure to these levels of atrazine for a lifetime results in an acceptable level of risk.

Hartley Report, Doc. 93, exhibit A, at 2. Hartley acknowledged that the triazine levels in District 3's water did peak during the spring months, but, because the levels for the remainder of the year were significantly lower, the overall triazine levels remained within acceptable limits.

(Doc. 83, exhibit 13 *and* Doc. 93, exhibit A). Also, Deposition of Junior Ory Aucoin, at 118–124 (Doc. 93, exhibit B) and Deposition

Aucoin's other basis for believing District 3 to be in violation of the SDWA is that Louisiana regulators informed him that the District had an Atrazine problem. However, such belief is belied by the documentary evidence submitted to this Court. A letter from the Louisiana Department of Agriculture and Forestry to Atrazine Manufacturers dated January 7, 1998 indicates that, in 1995, District 3 had a yearly Atrazine concentration in its finished water of 2.97 ppb—below, though just barely, the MCL. In 1996, the annual Atrazine level in the finished water was 2.87 ppb. The 1997 levels were not then complete, though they did show a spike in triazine levels in March and April of that year. (Letter attached to Doc. 83 as exhibit 14). Likewise, the Louisiana Department of Health and Hospitals reported that, for the first three quarters of 1998, the average Atrazine level in District 3's finished water was 2.92 ppb. (Letter and Report attached to Doc. 83 as exhibit 15). Thus, though Louisiana officials may have expressed concern regarding the seasonal peaks in Atrazine levels in District 3, never was the District in violation of EPA standards which require computation based upon a yearly average.

### Bowling Green, Ohio

The City of Bowling Green, Ohio draws its water both from the Maumee River and from its own reservoir. When the river water has fewer contaminants than the reservoir, the City waterworks replenishes its reservoir by pumping water directly from the river into the reservoir, thereby diluting the contaminant levels in the reservoir. By the same token, when the reservoir has fewer contaminants than the river, as is usually the case during the summer months, the City draws only on that source. Because of these procedures, Bowling Green tests both the river and the reservoir for contaminants.

Unlike Iberville Parish Waterworks District No. 3, Bowling Green has begun

of Brian Peek, at 100–102 (Doc. 83, exhibit D).

studying the utility of a full-scale GAC filtration system. Bowling Green installed a pilot study system which included GAC filters after developing a "Master Plan" for the expansion and improvement of the City's water treatment facility and determining that it wished to incorporate innovative treatment procedures into any treatment system it might install.[4] With the success of its pilot study, Bowling Green now intends to install a full-scale treatment system which includes GAC filters.

It is undisputed that Bowling Green has never been out of compliance with EPA Atrazine guidelines.[5] Moreover, it is undisputed that Bowling Green decided to install the GAC system in order to improve the clarity and taste of the City's drinking water so that the City could maintain its competitive advantage over bottled water producers (Stockburger deposition, 49:8–50:24). Atrazine removal was no more than an ancillary benefit.

Plaintiffs argue that there is a genuine issue of material fact because Bowling Green tests its raw water for Atrazine (Langenderfer deposition, 98:18–101:18). However, Mr. Langenderfer also testified that the reason Bowling Green tested raw water voluntarily and that the test results helped Bowling Green decide whether to pump water from the Maumee River into its reservoir. *Id.*, 100:23–102:2. There is no indication that Bowling Green tested its raw water to ensure compliance with the Atrazine MCL.

Additionally, Bowling Green seeks to recoup its expenditures for PAC dating back

at least to 1968. Bowling Green has made no showing that PAC treatments were mandated be the SDWA or any other statute. Moreover, Bowling Green points to no fact that would tend to establish that it deployed PAC specifically to combat Atrazine contamination.

## CONCLUSIONS OF LAW

### I. Justiciability and Standing to Sue.

 Under the justiciability doctrine, the Judicial Branch is constrained from exercising the powers reserved to the coordinate branches of government.[6] Thus, before a court may exercise jurisdiction over any matter, there must be a case or controversy before it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). *Lujan* establishes that, for there to be a justiciable controversy, Plaintiffs must establish that an irreducible constitutional minimum of standing containing three elements exists. *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is both (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *see Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 31 L.Ed.2d 636, (1972); *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

**4.** Request for Proposals by City of Bowling Green, Doc. 83, Exhibit 2; Proposal of the Poggemeyer Design Group, Inc., *Id.*, Exhibit 3; Bowling Green Water Treatment Master Plan, *Id.*, Exhibit 4; Deposition of Daryl Stockburger, *Id.*, Exhibit 5 at 175:12–18. *Also*, Langenderfer deposition at 30:9–12.

**5.** Stockburger deposition, 49:12, 130:12, 161:4; Langenderfer deposition 117:11.

**6.** As Judge Robert Bork, then of the Court of Appeals for the District of Columbia, wrote

"all of the doctrines that cluster around Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an ideal, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C.Cir.1982).

Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *see Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450, (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct. 1917. A particularized harm is one which affects the Plaintiff in a personal or individual way. *Lujan,* 504 U.S. at 561, n. 1, 112 S.Ct. 2130.

■ The party invoking federal jurisdiction bears the burden of establishing these elements at every stage of the litigation. *see FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Warth v. Seldin,* 422 U.S. at 508, 95 S.Ct. 2197; *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). These are not mere pleading requirements, but constitute an indispensable part of the plaintiff's case. Each element must be supported with the manner and degree of evidence required at the successive stages of the litigation. *see Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 114–115, and n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66(1979); *Simon v. Eastern Kentucky Welfare,* 426 U.S. at 45, n. 25, 96 S.Ct. 1917. Thus, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice. On a motion to dismiss, the Court will "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Federation,* 497 U.S. at 889, 110 S.Ct. 3177. However, in opposing a summary judgment motion, the Plaintiff can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.

F.R.Civ.P. 56(e). Finally, at the trial stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone v. Village of Bellwood,* 441 U.S. at 115, n. 3, 99 S.Ct. 1601.

**1. Costs of Removing Atrazine from Raw Water.**

■ It is clear to this Court that District 3 has failed to establish either that it has presented a justiciable claim or that any claim it may have is ripe. District 3 does not, and cannot, show any injury-in-fact. The District has, quite simply, suffered no concrete and particularized invasion of a legally protected interest. Though the Board members may have *believed* they were in violation of the SDWA's M.C.L. § for Atrazine, the District was never in violation under the terms of the SDWA or the regulations promulgated thereunder by the EPA. The evidence presented to this Court clearly indicates that, while District 3 does experience seasonal peaks in triazine levels in its water supply, under the formula set forth by the EPA calling for an annualized average of Atrazine levels, the District has not been out of compliance for Atrazine.

Much the same holds true for Bowling Green, Ohio. There is nothing to show that Bowling Green was ever out of compliance with the Atrazine MCL. Nor is there any evidence tending to show that Bowling Green installed its GAC pilot program in order to remove Atrazine from its drinking water. Rather, it is clear that Bowling Green installed its pilot program, and now plans to upgrade its entire water treatment system, in order to improve the taste and clarity of Bowling Green's water and, in the doing, to maintain the City's competitive edge over bottled water manufacturers. Removing Atrazine from the drinking water was, at best, an ancillary benefit of having better tasting and clearer drinking water.

Because both District 3 and Bowling Green are in compliance with the SDWA

drinking water standards, it cannot be said that either has suffered any actual invasion of a legally protected interest. Both water systems seek recompense for an injury that has not, and may never, occur.[7] To obtain such forward-looking relief a Plaintiff must prove that the injury-in-fact is both particularized and imminent. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 2104, 132 L.Ed.2d 158 (1995); *The Alabama Freethought Assoc. v. Moore*, 893 F.Supp. 1522, 1530 (N.D.Ala. 1995). A particularized harm is one which affects the Plaintiff in a personal or individual way. *Lujan v. Defenders of Wildlife*, 504 U.S. at 561, n. 1, 112 S.Ct. 2130. An imminent injury is one which must be "certainly impending" and must present a "real and immediate threat of future harm." *Adarand Constructors v. Pena*, 115 S.Ct. at 2104; *Lujan v. Defenders of Wildlife*, 504 U.S. at 564, n. 2, 112 S.Ct. 2130.

While Atrazine contamination may well affect both District 3 and Bowling Green in an individual way, albeit not in a way that, at present, causes legal harm, there is no indication that either system is in imminent danger of exceeding the Atrazine MCL. Plaintiffs have presented nothing to indicate that Atrazine levels in their water sources are rising in any predictable manner such that it is clear that the levels will certainly violate the MCL. Neither has either Plaintiff presented evidence that would, in some manner, show a significant increase in Atrazine usage which would result in a definite increase in Atrazine levels. Without any indication of an imminent and nearly certain threat of injury, both Plaintiff's claims amount to little

more than conjecture and are claims for which no standing will lie. *see e.g. Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998); *Department of Commerce v. United States House of Representatives*, —— U.S. ——, 119 S.Ct. 765, 773, 142 L.Ed.2d 797 (1999); *Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Whitmore v. Arkansas* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

Plaintiffs' contend that they do, in fact, have standing by virtue of the jurisprudential tradition allowing pre-enforcement suits to enjoin enforcement of a statute. Plaintiff points the Court to a long line of cases in which Plaintiffs have been allowed to raise Constitutional challenges to criminal statutes prior to their being prosecuted under those statutes. *see e.g. Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1972); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 491, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *Colautti v. Franklin*, 439 U.S. 379, 383–84, n. 3, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Planned Parenthood Ass'n of the Atlanta Area, Inc. v. Miller*, 934 F.2d 1462, 1468 (11th Cir.1991); *Athens Lumber Co. v. FEC*, 689 F.2d 1006, 1013 (11th Cir.1982). The distinguishing characteristics of each of those cases are that the Plaintiff was challenging the Constitutionality of the statute and that the Plaintiff stated with metaphysical certainty that he or she would be prosecuted under the challenged statute.

The argument stems from the reasoning of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct.

---

**7.** For District 3, see: Aucoin deposition, Doc. 93, Exhibit B, 103:3–108:20. It is worthy of note that Mr. Aucoin, in discussing the his concerns regarding Atrazine contamination and the his (and presumably the Board's) reasons for desiring to install a GAC filtration system, testified that he did not wish only to bring District 3 into compliance with the Atrazine MCL, but rather, that he wanted a system that would remove any and all Atrazine from the drinking water. Aucoin deposi-

tion, 108:8–9. Additionally, Mr. Aucoin testified that he believed Atrazine should either be removed from drinking water entirely or removed from the market. *Id.* at 12–13.

For Bowling Green, see: Stockburger deposition, attached to Doc. 83 as Exhibit 5, at 49:12, 130:12, 161:4. The material before this Court makes it quite clear that Bowling Green's upgrade to a GAC filter system was solely for the purposes of improving taste and clarity.

746, 27 L.Ed.2d 669 (1971). In *Younger,* the Supreme Court held that, once a criminal proceeding is pending in state court, a defendant is precluded from challenging the constitutionality of that statute. Therefore, a person should have the opportunity to challenge the constitutionality of a statute as soon as state sanctions have been threatened. *Virginia v. American Booksellers Ass'n. Inc.,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). In *Virginia v. American Booksellers,* the Court concluded that the Plaintiffs had standing to challenge Virginia's newly enacted obscenity statute prior to its being enforced both because they alleged an actual and well-founded fear that the law would be enforced against them and because the statute, requiring as it did an amount of self-censorship, could cause a chilling effect on expression without an actual prosecution. *Id.*

■ This Court harbors no such concerns. It is not clear that Plaintiffs here will ever become subject to the enforcement provisions of the SDWA. Neither does the threat of enforcement pose any threat to the public weal such that a pre-enforcement suit is warranted. Finally, it is clear that pre-enforcement actions are allowed only in narrow circumstances—where the very constitutionality of a statute is in question; where the Plaintiffs are under a concrete threat of prosecution under the statute; and, where there is a strong public interest in resolving the constitutionality of the statute prior to its being enforced. None of those circumstances is present here.

Because Plaintiffs have established neither an actual injury nor the impending threat of such an injury, the Court need not inquire into whether there is a causal connection between Novartis' manufacture of Atrazine and its presence in District 3's and Bowling Green's water or whether any such injury will be redressed by a favorable ruling. The three elements of standing are part of an absolute and irreducible Constitutional minimum and without one

aspect there is, and cannot be, standing before a federal court. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. at 471, 102 S.Ct. 752; *Northeastern Florida Chapter of the Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 661–62, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586 (1993); *Lujan v. Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130; *United States v. Hays,* 515 U.S. 737, 740–46, 115 S.Ct. 2431, 2434–36, 132 L.Ed.2d 635 (1995). Therefore, because neither District 3 nor Bowling Green have established standing to assert claims for costs incurred in removing Atrazine from drinking water, Defendant's Partial Motion for Summary Judgment is due to be granted and those claims dismissed.

**2. Costs of Testing Raw Water**

■ Both Plaintiffs also claim that they have incurred costs of monitoring raw water for the presence of Atrazine. It is clear that the EPA requires public and community water systems to test their finished water. 40 CFR § 141.24(f)(2). District 3 lacks standing, not only for that reason, but also because District 3 does not pay for the testing that is performed—both the State of Louisiana and the Defendant conduct raw water testing for District 3 (Deposition of Brian Peek, 45:14–23, 77:22–23, attached as Exhibit 12 to Doc. 83). By the same token, though Bowling Green *does* conduct its own raw water testing, it does so voluntarily and not pursuant to an EPA directive.

Plaintiffs' sole argument in favor of recovering raw water testing costs is that it simply makes sense for a treatment facility to test its raw water in order to ascertain how aggressively it must treat its water. Plaintiffs' argument is disingenuous—the fundamental basis of all Plaintiffs' claims is that Congress and the EPA mandated that local water systems monitor and treat their water for Atrazine and that the taxpayers should not be obliged to pay for those activities, but rather, that Novartis

should bear the costs of monitoring and treating the nation's drinking water for Atrazine. The problem is: neither Congress nor the EPA requires testing of raw drinking water. Thus, there is no unfunded mandate and no need for District 3 or Bowling Green to shift costs to anyone.

## II. Ripeness.

█ A distinct issue in assessing whether the parties have standing to bring a claim is the question of whether a claim is ripe for adjudication. The ripeness doctrine prevents courts from entering the fray prematurely and thereby interfering with the administrative decision making process. The courts may only review an Executive or Legislative decision after that decision has been formalized *and* after that decision has impacted the challenging parties in a concrete manner. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Wilderness Society v. Alcock,* 83 F.3d 386, 389 (11th Cir.1996). In deciding whether an issue is ripe for adjudication, then, the Court determine whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature and the issues sufficiently defined and concrete to allow effective adjudication by the Court. *Socialist Workers Party v. Leahy,* 145 F.3d 1240, 1244 (11th Cir.1998) *citing Digital Properties, Inc. v. City of Plantation,* 121 F.3d 586, 589 (11th Cir.1997) *and Cheffer v. Reno,* 55 F.3d 1517, 1524 (11th Cir.1995); see *also, Abbott Labs. v. Gardner,* 387 U.S. at 149, 87 S.Ct. 1507.

█ Even assuming that Plaintiffs have properly established the constitutional requirements for standing, their claims are not ripe for adjudication. A claim that rests upon contingent future events that may, or may not, occur as anticipated or may not occur at all is not ripe for adjudication. *Texas v. United States,* 523 U.S. 296, 118 S.Ct. 1257, 1259, 140 L.Ed.2d 406 (1998); *Atlanta Gas Light Co. v. Fed'l Energy Reg. Comm'n,* 140 F.3d 1392, 1404 (11th Cir.1998). Plaintiffs' case fits squarely within those which are not ripe. As was stated above, there is nothing to show that Plaintiffs are, or will soon be, in violation of the Atrazine MCL.

█ Additionally, even were the Plaintiffs in violation of EPA regulations, the Plaintiffs have not exhausted the available administrative remedies. The SDWA provides a procedure under which a public water system may obtain a variance from the MCL. 42 U.S.C. § 300g–4(e)(1)–(10). Additionally, there is an established procedure for a community water system to obtain an exemption from both the MCLs and the treatment technique requirements. 42 U.S.C. § 300g–5.[8] Finally, Congress has provided several programs offering financial and technical assistance to the States and to public and community water systems which provide partial funding for improvements to water supply systems. see *e.g.* 42 U.S.C. § 300j–3c(a).[9]

There is no evidence to suggest that either water system here has sought out either guidance or assistance from the EPA in addressing their perceived Atrazine problems. For the Court to intervene in the relations between local governmental agencies and the federal government prior to any action being taken by either party runs perilously close to the Judicial Branch becoming entangled in policy (and political) matters. For that reason, the Court finds that, even if Plaintiffs have standing before this Court, the case or

---

8. It is worthy of particular note that exemptions are available upon a finding by the State or by the Administrator of the EPA that, due to a compelling factor—which may include economic factors—a system is unable to comply with the M.C.L. § or treatment technique. 42 U.S.C. § 300g–5(a)(1).

9. In § 300j–3c, Congress provided for an unconditional appropriation of $25,000,000.00 per fiscal from fiscal 1997 through fiscal 2003.

controversy is not yet ripe for adjudication.

### CONCLUSION

For the forgoing reasons, then, it is clear that both District 3 and Bowling Green lack standing to recover either the costs of removing Atrazine from their drinking water or monitoring raw water for the presence of Atrazine. Moreover, even assuming, *arguendo*, that Plaintiffs do have proper standing, their case is not ripe for adjudication.

Therefore, it is hereby **ORDERED** that Defendant's Motion for Partial Summary Judgment is hereby **GRANTED** and Plaintiffs' claims are therefore **DISMISSED**.