458 F.Supp.2d 149 (2006)
In re METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION,
This document relates to: United Water New York, Inc. v. Amerada Hess Corp., et al., 04-Civ-2389,
Suffolk County & Suffolk County Water Authority v. Amerada Hess Corp., et al., 04-Civ-5424,
City of New York v. Amerada Hess Corp., et al., 04-Civ-3417,
Orange County Water District v. Unocal Corp., et al., 04-Civ-4968.
No. 1:00-1898, MDL 1358(SAS), M 21-88.
United States District Court, S.D. New York.
October 10, 2006.
*151 Michael Axline, Tracy O'Reilly, Miller, Axline & Sawyer, Sacramento, CA, for Orange County Water District.
Robin Greenwald, Robert Gordon, C. Sanders McNew, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.
Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery LLP, New York, NY, for Defendants.

OPINION AND ORDER
SCHEINDLIN, District Judge.

1. INTRODUCTION
In this consolidated multi-district litigation ("MDL"), plaintiffs seek relief from contamination, or threatened contamination, of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA"), which is a product that is formed by the natural degradation of MTBE in water. The parties have already engaged in extensive motion practice, and familiarity with the Court's previous opinions is assumed.[1] The facts underlying this case are comprehensively set out in those opinions.[2]
Defendants now move for summary judgement on all claims in the three captioned *152 New York actions for lack of standing.[3] Additionally, defendants move for summary judgment on Orange County Water District's ("OCWD") claims relating to MTBE contamination below the Secondary MCL.[4] Defendants argue that the alleged MTBE contamination has not impaired any of plaintiffs' legally protected interests and therefore plaintiffs have not suffered a cognizable "injury-in-fact." Accordingly, defendants argue, plaintiffs lack Article III standing and their claims must be dismissed. For the reasons discussed below, defendants' motions are denied.

II. APPLICABLE LAW

A. Summary Judgement
Summary judgment is only appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[5] An issue of fact is genuine if "`the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'"[6] while a fact will be deemed material where it "`might affect the outcome of the suit under the governing law.'"[7]
The moving party bears this burden of demonstrating that there exists no genuine issue of material fact.[8] In turn, to defeat a motion for summary judgment, the nonmoving party must raise a genuine issue of material fact that does "not rely on conclusory allegations or unsubstantiated speculation." [9] To do so, it must do more than show that there is "`some metaphysical doubt as to the material facts.'"[10] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[11]

Article III Standing
The Constitution of the United States expressly limits the federal judicial power to certain enumerated "cases" or *153 "controversies."[12] The purpose of this limitation is, among other things, to ensure that matters brought before the federal courts are appropriate for adjudication.[13]
In articulating the doctrine of standing the Supreme Court has identified an "irreducible constitutional minimum" that must be shown by a party seeking redress.[14] Although this minimum is comprised of three distinct elements,[15] only one is at issue here: a plaintiff must have suffered an injury-in-fact, that is, the invasion of a "legally protected interest" in a manner that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[16] The injury-infact requirement, along with the other elements of standing, serve to ensure that judicial resources are "devoted to those disputes in which the parties have a concrete stake," [17] and where their actual adversity will serve to sharpen and define the issues presented to the court for resolution.[18]
Because the requirements of standing are "not mere pleading requirements," but rather an "indispensable part" of a claim, each element must be supported "with the manner and degree of evidence required" at each successive stage of litigation.[19] Accordingly, at the summary judgement stage, a plaintiff "can no longer rest on mere allegations [of injury], but must set forth specific facts ... which for purposes of the summary judgement motion will be taken to be true."[20]

III. DISCUSSION

A. Maximum Contaminant Levels
In order to ensure public safety, state and federal regulatory authorities promulgate water quality standardsknown as the "Maximum Contaminant Level" ("MCL")which establish the highest amount of any contaminant that may be present in drinking water provided to the public.[21] In New York, the New York State Department of Health ("NYSDOH") has set the current MCL for MTBE at 10 parts-per-billion ("ppb").[22] In California, the California Department of Health Services ("DHS") has adopted two MCLs for *154 MTBE: a Primary MCL of 13 ppb which is based on health related concerns, and a Secondary MCL of 5 ppb which is based on the taste and odor concerns associated with MTBE contamination.[23]
The essence of the dispute here is the extent to which an MCL defines what constitutes a legally cognizable harm. Defendants argue that New York water purveyor plaintiffs' "only legally protected interest is in the right to serve drinking water that complies with federal and state law."[24] Likewise, defendants argue that OCWD's interests are limited to investigation and remediation of the groundwater aquifer in accordance with state water quality standards.[25] That is, plaintiffs' protected interestsand the corollary of what conduct can injure those interestsare defined by the applicable MCL: only contamination in excess of the MCL can constitute an injury.[26] Because the vast majority of the New York plaintiffs' wells (or in the case of OCWD, wells within its district) are not contaminated above the MCL, they have failed to demonstrate injury-in-fact as required by Article III.[27] Plaintiffs counter that although their interest is in serving potable water or protecting groundwater, the scope of that interest is not limited by the MCL.[28] Thus, the New York water purveyor plaintiffs argue that although they are themselves required to serve water that complies with the MCL, defendants' conduct resulting in contamination (even at levels below the MCL) is an invasion of their legally protected interest because of the resulting costs of monitoring and remediating contamination, as well as the *155 MTBE-associated problems with taste and odor. Likewise, OCWD argues its interests are independent of the applicable MCL: "[T]he District need not establish any levels of MTBE in wells in order to claim damages. Rather, the District must establish that the District has incurred recoverable expenses in carrying out its statutory duties to address threatened MTBE contamination."[29]

B. Does the MCL Define the Scope of Plaintiffs' Protected Interest?
Defendants suggest that the law is "well-settled" that the presence of contaminants at levels below the applicable MCL cannot constitute an injury-in-fact.[30] However, an examination of the relevant caselaw reveals more uncertain terrain. Ultimately, nothing in those decisions (or others reviewed by this Court) compels a holding that the applicable MCL establishes a bright-line rule defining the scope of plaintiffs' protected interests or what legally constitutes an injury.
A few courts have heldas defendants here urge this Courtthat contamination below the applicable MCL cannot give rise to a legally cognizable injury. These decisions, however, are generally unpersuasive as they are either factually dissimilar or provide little analysis of the underlying standing inquiry.
For example, both Adams v. A.J. Ballard, Jr. Tire & Oil Co.,[31] and Brooks v. E.I. Du Pont De Nemours & Co.,[32] involve individual, private well owners who (unlike plaintiffs here) did not have the same statutory duty to protect or remediate groundwater. The question of whether an individual, private well owner has been injured by contamination below the MCL is a substantially different question than that presented here. Indeed, in Adams, the court found it "significant" that "the statutory scheme requires remediation to achieve minimum standards [i.e., compliance with the MCL]."[33] The court went on to hold that the plaintiffs did not have standing where the MCL had not been exceeded because such contamination "do[es] not create a threat to human health or render the groundwater unsuitable for its intended purpose."[34] By contrast, plaintiffs here have a duty to take actionbe it testing, monitoring, or treating contaminated wellsbefore that contamination reaches the applicable MCL.[35] Thus, plaintiffs' protected interests may be interfered with whenever contamination affects the quality of the water from which they supply the *156 public, or in the case of OCWD, the groundwater it is statutorily tasked with protecting.[36]
Defendants also place heavy reliance on Iberville Parish Waterworks District No. 3 v. Novartis Crop Protection, Inc.,[37] involving plaintiffs similar to the New York water purveyors, where the court held that because contamination levels had not exceeded the applicable MCL "it cannot be said that [plaintiffs have] suffered any actual invasion of a legally protected interest." [38] A close reading of Iberville, however, reveals that the court's decision was influenced, at least in part, by the fact that little, if any, of the treatment or remediation expense incurred by the plaintiffs was due to the alleged contamination.[39] Further, some of the expenses claimed as an injury had yet to be fully incurred.[40] Accordingly, the court determined that "[b]oth water systems seek recompense for an injury that has not, and may never, occur."[41] Unlike in Iberville, the plaintiffs here claim injuries directly related to the alleged MTBE contaminationnamely, they have expended resources to monitor, test, and treat groundwater because of MTBE contamination.[42]
More importantly, none of these decisions provide a persuasive reason why the MCL should establish the scope of the protected interest or define, as a matter of law, what is and what is not an *157 injury. The plaintiffs correctly argue that the "MCL is a regulatory standard that governs [water providers'] conduct in supplying water to the public but not the Defendants' conduct in manufacturing and selling a defective product."[43] Defendants do not argueand this Court does not holdthat an MCL displaces common law tort liability resulting from groundwater contamination.[44]
And, while courts have looked to applicable MCLs to determine whether an injury has occurred, they have not held that an injury cannot have occurred.[45] The court's analysis in Rose v. Union Oil Company [46] is instructive. There, plaintiffs brought both statutory and common law tort claims relating to contamination at levels below the applicable MCL. Using the MCL as a baseline, the court rejected plaintiffs' statutory claims because such low level contamination did not present a "substantial endangerment" to health or the environment.[47] However, before dismissing plaintiffs' common law tort claims, the court undertook a more thorough analysis as to whether the contamination had *158 actually injured plaintiffs.[48] To be sure, both claims were eventually dismissed, based in part on the MCL. But the twopart analysis underscores an important distinction between determining that an injury cannot legally occur (i.e., contamination below the MCL cannot give rise to an injury), and determining that an injury has not or is unlikely to occur (i.e., contamination below the MCL is unlikely to give rise to an injury).[49]
I therefore conclude that while the MCL may serve as a convenient guidepost in determining that a particular level of contamination has likely caused an injury, the MCL does not define whether an injury has occurred.[50] Although linking injury to the MCL would provide a bright-line rule, it would do little else to promote standing principles.[51] Rather, this conclusion comports with the essential principles underlying the standing doctrine: the parties here have adverse interests and the complained of conduct is concrete and specifically impacts plaintiffs' zone of protected interests. While it may eventually be determined that some levels of contamination below the applicable MCLs do not injure plaintiffs' protected interests, plaintiffs have presented sufficient evidence for purposes of standing to show that they may have been injurednot as a theoretical matter, but rather as a question that is appropriate for judicial resolution.

C. Summary Judgment Is Premature
Accordingly, the question on summary judgement is whether there is a genuine issue of material fact in regard to plaintiffs' alleged injuries. At this point the parties disagree as to whether plaintiffs can prove that they either suffered an injury or sustained any damage from the alleged MTBE contamination. However, because defendants' primary argument in this motion is that contamination below the applicable MCL cannot constitute an injury, the scope of factual disagreement here *159 is confined largely to those few wells that exhibit contamination exceeding the MCL.[52] As such, it would be premature for this Court to rule on summary judgment. Nevertheless, an examination of the recordalbeit limitedmay be useful to the parties (and indirectly to this Court) as they engage in the remainder of pretrial discovery.[53]
Plaintiffs argue that they have been injured by low level MTBE contamination because it compromises the quality of the water supply through its offensive taste and odor.[54] Defendants do not dispute that low level contamination may adversely impact water supplies; however, they contend that plaintiffs have not suffered any such injury because they have "never received a `taste and odor' complaint that was attributed to MTBE."[55] Plaintiffs point to various customer complaints regarding taste and odor which they have investigated, and argue that such complaints likely resulted from MTBE contamination.[56] However, plaintiffs have not presented any evidence (other than statements of their belief) that such complaints are actually due to MTBE contamination.[57] Unless plaintiffs can produce evidence that these complaints are due to MTBE contamination, such speculation will be insufficient to defeat summary judgment in favor of defendants as to plaintiffs' claimed injuries relating to taste and odor.
Plaintiffs also complain that they have been injured by increased monitoring, testing, and treatment costs, and in some instances have been forced to shut down certain wells because of contamination. With respect to several wells, the parties *160 dispute whether treatment procedures have been taken because of MTBE or other contaminants. For example, defendants contend that United Water New York's ("UWNY") costs associated with one well's treatment (Tallman 26) are related to earlier freon contamination rather than as a result of any MTBE contamination.[58] However, UWNY notes that while the treatment system was originally installed to treat freon, the subsequent presence of MTBE required it to respond by improving the filtration system.[59] Factual issues regarding why the system was installed, the costs of the improvement, and the extent to which the costs of current filtration are due to MTBE contamination (or to other contaminants) are likely triable issues inappropriate for resolution through summary judgment.[60]
On this record it cannot be said that the defendants are entitled to a judgement as a matter of law. Rather, these and similar well specific disputes require further fact development, and potentially briefing, to determine the extent to which genuine issues of fact remain in dispute.

IV. CONCLUSION
For the reasons set forth above, defendants' motions for summary judgement are denied. The Clerk of the Court is directed to close these motions (docket # 867 and # 1018).
SO ORDERED:
NOTES
[1] See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 447 F.Supp.2d 289 (S.D.N.Y.2006); In re MTBE Prods. Liab. Litig., 438 F.Supp.2d 291 (S.D.N.Y.2006); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 457 F.Supp.2d 324, 2006 WL 1738233 (S.D.N.Y. June 23, 2006); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 2006 WL 928997 (S.D.N.Y. Apr.7, 2006), motion for reconsideration denied, 2006 WL 1816308 (June 26, 2006); In re MTBE Prods. Liab. Litig., 415 F.Supp.2d 261 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., 399 F.Supp.2d 340 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., 399 F.Supp.2d 325 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. June 28, 2005); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 2005 WL 1500893 (S.D.N.Y. June 24, 2005); In re MTBE Prods. Liab. Litig., 402 F.Supp.2d 434 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., 399 F.Supp.2d 242 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., 233 F.R.D. 133 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., 379 F.Supp.2d 348, 364 (S.D.N.Y.2005); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan.18, 2005); In re MTBE Prods. Liab. Litig., No. M21-88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan.6, 2005); In re MTBE Prods. Liab. Litig., 364 F.Supp.2d 329 (S.D.N.Y.2004); In re MTBE Prods. Liab. Litig., 361 F.Supp.2d 137 (S.D.N.Y.2004) ("MTBE VI"); In re MTBE Prods. Liab. Litig., 341 F.Supp.2d 386 (S.D.N.Y.2004) ("MTBE V"); In re MTBE Prods. Liab. Litig., 341 F.Supp.2d 351 (S.D.N.Y.2004) ("MTBE TV"); In re MTBE Prods. Liab. Litig., 342 F.Supp.2d 147 (S.D.N.Y.2004) ("MTBE III"); In re MTBE Prods. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y.2002) ("MTBE II"); In re MTBE Prods. Liab. Litig., 175 F.Supp.2d 593 (S.D.N.Y.2001) ("MTBE I").
[2] For a thorough recitation of plaintiffs' fact allegations see, for example, In re MTBE Prods. Liab. Litig., 379 F.Supp.2d at 364-67.
[3] Defendants style their motion against the New York plaintiffs as one for summary judgment for "lack of justiciability." See Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment on All Claims for Lack of Justiciability ("Def.Mem.(N.Y.)"). This Opinion frames the argument as one for lack of standing because the doctrine of justiciability properly encompasses a broader scope of related prudential limitations (e.g., non-justiciable political questions). See Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (noting that the concept of justiciability includes standing and other doctrines).
[4] The summary judgment motion as to OCWD challenges plaintiff's standing to bring its claims. See Defendants' Memorandum of Law in Support of Motion for Summary Judgment of Plaintiff's Claims for Damages Based on MTBE Detections Below the Secondary MCL ("Def.Mem.(OCWD)") at 9.
[5] Fed.R.Civ.P. 56(c).
[6] Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir.2006) (quoting Stuart v. American Cyanamid Co., 158 F.3d 622,626 (2d Cir.1998)).
[7] Bouboulis v. Transport Workers Union of Am., 442 F.3d 55, 59 (2d Cir.2006) (quoting Anderson v. Liberty Lobby, Inc., Ml U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[8] See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005).
[9] Id. (quoting Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir.2001)) (quotation marks omitted).
[10] McClellan v. Smith, 439 F.3d 137, 144 (2d Cir.2006) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
[11] See id. (citing Anderson, 477 U.S. at 255, 106 S.Ct. 2505).
[12] U.S. Const, art. Ill, § 1.
[13] See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (standing requirements serve to "`identify those disputes which are appropriately resolved through the judicial process'") (quoting Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)).
[14] Id. at 561, 112 S.Ct. 2130.
[15] The other two requirements are that the plaintiff's injury must be "fairly traceable" to the defendant's alleged conduct, and it must be likely that the injury will be "redressed by a favorable decision." Id.
[16] Id. (quotation marks and citations omitted).
[17] Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).
[18] See Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
[19] Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
[20] Id. (quotation marks and citations omitted).
[21] See 10 N.Y. Comp.Codes R. & Regs. § 51.1(a1) (2006) ("MCL means the maximum permissible level of a contaminant in water which is delivered to any user of a public water system."); California Health & Safety Code § 116275(f) ("[MCL] means the maximum permissible level of a contaminant in water.").
[22] 10 N.Y. Comp.Codes R. & Regs. § 5-1.52, Table 3. Prior to December 24, 2003, the applicable New York MCL for MTBE was 50 ppb.
[23] See Def. Mem. (OCWD) at 1. Defendants' motion is limited only to those claims relating to detection below the Secondary MCL. See id. at 10 n. 7 ("Although not an issue in this motion, defendants do not concede that damages are recoverable based on detections above the Secondary MCL of 5 ppb but below the Primary MCL of 13 ppb."). Ultimately, the difference between California's two MCLs or between the New York and California MCLs is not relevant to the question of whether the MCL generally defines what constitutes a legally cognizable injury. Nevertheless, California's Secondary MCL would be very relevant to determining whether any claimed injuries regarding taste and odor had harmed OCWD.
[24] Def. Mem. (N.Y.) at 2. Defendants frame plaintiffs' interest as serving "potable" water, a concept which is, in turn, defined by the applicable MCLs. See id. at 4. See also id. at 6 ("`Potable water means a water which meets the requirements established by this Subpart.'") (quoting 10 N.Y. Comp.Codes R. & Regs. § 5-1.1).
[25] See Def. Mem. (OCWD) at 12 ("The OCWD Act does not confer the right on OCWD to sue to prevent alleged detections of contaminants that the State does not consider actionable."). See also Defendants' Reply Memorandum in Support of Motion for Summary Judgment of Plaintiff's Claims for Damages Based on MTBE Detections Below the Secondary MCL ("Def.Rep.Mem.(OCWD)") at 5 ("OCWD asserts the right to seek relief and recover damages to protect the drinking water supplies of water purveyors. Obviously, to exercise such a drinking water protection mandate, OCWD (and this Court) must apply some standard for what level of MTBE threatens drinking water. DHS established that standard through the MCLs.")
[26] See Def. Mem. (N.Y.) at 6; Def. Rep. Mem. (OCWD) at 10.
[27] See Def. Mem. (N.Y.) at 7-9; Def. Mem. (OCWD) at 7, 9.
[28] The New York water purveyor plaintiffs point to other provisions of the regulations to argue that "potable" water must also mean "water that does not have an offensive odor and taste and is safe to drink," and that they are "legally required" to provide "a safe, adequate and aesthetically pleasing supply of water." Plaintiffs' Response to Defendants Motion for Summary Judgement on All Claims for Lack of Justiciability ("Pl.Mem.(N.Y.)") at 3 (citing 10 N.Y. Comp.Codes R. & Regs. § 40-2.160).
[29] Pl. Mem. (OCWD) at 3.
[30] Def. Mem. (N.Y.) at 7. See also Def. Mem. (OCWD) at 10 ("Multiple courts have recognized in similar cases, OCWD does not have a legal right to recover for the alleged injury resulting from MTBE detections below the Secondary MCL.").
[31] No. 01-Civ-1271, 2006 WL 1875965 (N.C.Super. June 30, 2006).
[32] 944 F.Supp. 448 (E.D.N.C. 1996).
[33] Adams, 2006 WL 1875965, at *31.
[34] Id. (quotation marks and citations omitted).
[35] See Pl. Mem. (N.Y.) at 18; Plaintiff's Opposition to Defendants' Motion for Summary Judgment of Plaintiff's Claims for Damages Based on MTBE Detections Below the Secondary MCL ("Pl.Mem.(OCWD)") at 3. The New York water purveyor plaintiffs argue that their duty to monitor and treat contamination is not limited to instances where the MCL is exceeded, but also where there is "any deleterious change in raw water quality." 10 N.Y. Comp.Codes R. & Regs. § 5-1.12. OCWD argues that its duty is to "investigate and remediate `any threatened or existing contamination of, or pollution to, the surface or groundwaters of the district'" and that it is statutorily authorized to recover such costs. Pi. Mem. (OCWD) at 3 (quoting Cal. Water Code, app. § 40-8(b)).
[36] This Opinion does not consider whether, and to what extent, individual, private well owners (nor water consumers) may be damaged by contamination below the applicable MCL. The essential point here, is that the analyses from cases holding that private well owners do not have standing to sue for contamination below the MCL are not controlling with regard to public water suppliers and municipalities or state regulatory agencies. Indeed, individual well owners (and likewise, water consumers) may well have a different legally protected interest than providers of water or regulatory agencies.
[37] 45 F.Supp.2d 934 (S.D.Ala. 1999).
[38] Id. at 942.
[39] See id. at 940 ("[Plaintiff] decided to install the [filter system] in order to improve the clarity and taste of the City's drinking water so that the City could maintain its competitive advantage over bottled water producers. Atrazine removal was no more than an ancillary benefit."). See also id. at 941 (noting that "there is no evidence tending to show that [plaintiff] installed its [granulated active carbon filter ('GAC') ] program in order to remove Atrazine from its drinking water. Rather, it [was] ... to maintain the City's competitive edge over bottled water manufacturers").
[40] See id. at 939 (plaintiff had "used [powdered active carbon ('PAC') ] and makeshift GAC filters, but the results were not satisfactory.. . [and the plaintiff] determined to obtain a GAC filtration system") (emphasis added); id. at 942 n. 7 (plaintiff explained its "reasons for desiring to install a GAC filtration system") (emphasis added). Additionally, as to costs associated with the testing of raw water (as opposed to the treatment of drinking water), the court noted that no injury could arise from these costs because as to one plaintiff, the costs were borne by the state, and as to both plaintiffs such testing was not mandated by law.
[41] Id. at 942. The court went on to hold that because plaintiffs could not show that contamination levels were in danger of rising above the MCL there was no threat of "imminent injury." Id.
[42] In addition to expenses related to testing and remediation, plaintiffs also claim injury related to the offensive taste and odor associated with even low levels of MTBE contamination. See PI. Mem. (N.Y.) at 12-17. While the parties disagree as to the extent of plaintiffs' claimed injuries relating to taste and odor, see discussion infra Part III.C, Iberville is again distinguishable because the contamination there did not raise these concerns. See 8/22/06 Transcript of Oral Argument at 64-65. But see Adams, 2006 WL 1875965, at *32 (rejecting taste and odor as establishing a threshold for injury in view of the "bright line" of the MCL).
[43] Pl. Mem. (N.Y.) at 4. See Pi. Mem. (OCWD) at 1 ("[DJefendants argue that the regulatory ceiling for water purveyors' use of impaired drinking water sources (Secondary MCLs) is also a floor for tort damages."). See also Leuke v. Union Oil Co., No. 00-Civ-008, 2000 Ohio App. LEXIS 4845, at *12 (Ct.App. Oct. 20, 2000) (noting that the fact that "contamination levels in the water never exceeded levels considered to be safe merely showed compliance with regulatory standards and did not show [defendants] met the standard of care required under common law").
[44] In this regard, defendants' reliance on such cases as Z.A.O. v. Yarbrough Drive Ctr. Joint Venture, 50 S.W.3d 531 (Tex.Ct.App. 2001), is misplaced. The Z.A.O. decision was based on the understanding that common law duties relating to groundwater contamination had been "displaced" by statutory regulation and therefore "a private cause of action for trespass could not be maintained." Id. at 544. Likewise, the court's decision in Hartwell Corp. v. Super. Ct. of Ventura County, 27 Cal.4th 256, 115 Cal.Rptr.2d 874, 38 P.3d 1098 (Cal.2002), that California's statutory regime precluded some of plaintiffs' claims against certain regulated water providers is similarly unhelpful. Moreover, the Hartwell court went on to hold that damage claims against unregulated water providers could be maintained for claims above or below the MCL. See id. at 283, 115 Cal.Rptr.2d 874, 38 P.3d 1098. These cases present questions of regulatory preemption, not standing. See also Paredes v. County of Fresno, 203 Cal.App.3d 1, 249 Cal.Rptr. 593 (CaI.Ct.App.1988). Additionally, as noted earlier, water consumers, as in Hartwell, may have a different protected interest than water providers, and because a consumer's interest is tied to salubrity of the water received, the MCL may be more relevant there than here. See supra note 36.
[45] It is difficult to determine whether some of the decisions are based on lack of standing or on a factual analysis as to whether an injury occurred. See, e.g., Gleason v. Town of Bolton, No. 991194, 2002 WL 1555320 (Mass.Super.Ct. May 23, 2002) (finding that there was no evidence of harm to restaurant plaintiff because the contamination never exceeded the MCL, but also because the defendant town provided bottled water and ice when contaminant levels spiked). The Iberville decision reveals a similar confusion. See supra notes 37-41 and accompanying text.
[46] No. C97-3808, 1999 WL 51819, 1999 U.S. Dist. LEXIS 967 (N.D.Cal. Feb. 1, 1999).
[47] See id. at *9. Plaintiffs' statutory claims were brought under the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B). Defendants cite several other decisions involving statutory claims. See, e.g., Price v. United States Navy, 818 F.Supp. 1323 (S.D.Cal.1992); Vernon Village v. Cottier, 755 F.Supp. 1142 (D.Conn. 1992). Defendants' reliance on these decisions is misplaced because the inquiry in those cases is whether the contamination posed a threat to health or the environment, an inquiry for which the MCL is well suited. Determining whether contamination presents an injury to a protected interest is, however, a different inquiry.
[48] See Rose, 1999 WL 51819, 1999 U.S. Dist. LEXIS, at * 18-19.
[49] See, e.g., In re Wildewood Litig., 52 F.3d 499 (4th Cir. 1995) (private nuisance claim failed because contamination levels did not rise to levels of toxic concern); Cereghino v. Boeing Co., 873 F.Supp. 398 (D.Or. 1994) (plaintiffs stipulated that they had not been damaged by contamination below the MCL).
[50] See, e.g., German v. Federal Home Loan Mortgage Corp., 885 F.Supp. 537, 558-59 (S.D.N.Y.1995) (denying summary judgement where contamination was below regulatory MCL because whether plaintiff had been injured by lower levels of contamination remained in dispute). See also Bentley v. Honeywell Int'l, Inc., 223 F.R.D. 471, 478 n. 11 (S.D.Ohio 2004) ("Regardless of whether the municipal water supply has been deemed safe by the Ohio EPA and/or determined to be below the federal and state established maximum contaminant levels ('MCL'), the [plaintiffs] still may have suffered diminution in their property values ...") (dicta); City of Tulsa v. Tyson Foods, Inc., 258 F.Supp.2d 1263, 1297 n. 26 (N.D.Okla.2003) (vacated by settlement) (denying defendant polluter's summary judgement because municipal water authority plaintiffs' common law claims did not require a showing that complained of conduct resulted in violations of water standards causing a health hazard, only that "defendants' actions affected the quality of the Water Supply, which required plaintiffs to incur costs in assessment and treatment of the Water Supply"). Cf. New Mexico v. General Elec, 335 F.Supp.2d 1185, 1211 (D.N.M. 2004) ("[I]t may well be that the [plaintiff] has suffered an injury to its interest in groundwater..., notwithstanding the fact that much of the groundwater meets New Mexico drinking water standards, but it may be that the injury is not the total and permanent loss of drinking water that Plaintiffs now assert.").
[51] Nor is such precision necessarily possible or desirable when dealing with questions of standing. See, e.g., New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 14 (1st Cir.1996) ("[B]right lines grow faint in the area of standing.").
[52] Disagreement over the statute of limitations also limits the scope of factual disagreement here, as defendants argue that many of plaintiffs' claims are time-barred. See Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment Based on the Statute of Limitations.
[53] This following discussion of the record is drawn from the factual disputes between the New York plaintiffs and defendants. The dispute between OCWD and defendants, as outlined in their moving papers and supporting documents, is largely confined to the legal issue of whether contamination below the Secondary MCL can constitute an injury. Neither plaintiffs nor defendants presented any evidence to show whether such contamination has or has not injured OCWD.
[54] See Pl. Mem. (N.Y.) at 12 (citing various sources to show that low level contamination can render water supplies unusable because of taste and odor); Pi. Mem. (OCWD) at 18 (same).
[55] Def. Mem. (N.Y.) at 17. See Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgement on All Claims for Lack of Justiciability ("Def.Rep.Mem.(N.Y.)") at 6 ("Plaintiffs do not citebecause it does not existan actual 'taste and odor' complaint attributable to MTBE."). See also Defendants' Revised Rule 56.1 Statement in Support of Their Motion for Summary Judgment on All Claims for Lack of Justiciability ("Def.56.1") ¶ 24.
[56] Plaintiffs claim they have received taste and odor complaints which resulted from MTBE contamination, but that customers do not attribute the problem to MTBE. See 8/22/06 Transcript of Oral Argument at 67-68. See also Plaintiffs' Rule 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment on All Claims for Lack of Justiciability ("Pl.56.1") ¶ 24 (citing to customer complaints).
[57] Plaintiffs point to various customer complaints regarding taste and odor. See, e.g., 4/8/05 Letter from Suffolk County Water Authority to Customer, Ex. N to PI. Mem. (N.Y.) Although these complaints reveal that customers have complained about taste or odor, subsequent testing did not reveal the presence of MTBE or any problem with the taste or odor of the water. Nor do plaintiffs indicate that the complaints arose in areas where MTBE had allegedly contaminated the groundwater or any other fact from which it could reasonably be inferred that the complaints related to MTBE contamination.
[58] See Def. Rep. Mem. (N.Y.) at 10.
[59] See 2/23/06 Declaration of Donald Distante, UWNY's Engineering Manager, in Opposition to Defendants' Motion for Summary Judgment ¶¶ 7-9.
[60] Other wells present the same disputed issue of why the treatment system was originally installed. Compare Def. 56.1 ¶ 15 ("This GAC system was installed to treat tetrachlororethylene in 1992, before MTBE was detected in the well.") with Pl. 56.1 ¶ 15 (noting that the GAC system is necessary to treat MTBE and that the "system[ ][is] used to filter various organic compounds, including tetrachlororethylene").