240 F.3d 1149 (9th Cir. 2001)
 JANICE F. NODINE; ROGER D. NODINE, Plaintiffs-Appellants,
v.
SHILEY INCORPORATED, a California corporation; PFIZER, INC., a Delaware corporation; BRUCE FETTEL; GRINDLEY MANUFACTURING, INC., a California corporation; HOW MEDICA CORP., a Delaware corporation, Defendants-Appellees.
 No. 99-55611
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 11, 2000
Filed January 22, 2001
 
 COUNSEL: Graig R. Woodburn, Newport Beach, California, for the appellants.
 Aton Arbisser, Los Angeles, California, for the appellees.
 Appeal from the United States District Court for the Central District of California Gary L. Taylor, District Judge, Presiding. D.C. No.CV 97-431GLT(SA)Before: A. Wallace Tashima and Richard C. Tallman, Circuit Judges, and William Alsup, District Judge*
 Opinion by Judge Tashima; Dissent by Judge Alsup
 OPINION
 TASHIMA, Circuit Judge:
 
 
 1
 Plaintiffs-Appellants Janice F. Nodine ("Nodine") and Roger D. Nodine (collectively "plaintiffs") appeal the district court's grant of summary judgment in favor of Defendants Appellees Shiley Inc.; Pfizer, Inc.; Bruce Fattel; Grindley Manufacturing, Inc.; and Howmedica Corp. (collectively "Shiley") on plaintiffs' fraud claim concerning Nodine's Bjork-Shiley Convexo-Concave artificial heart valve ("BSCC valve"). Summary judgment was granted on two independent grounds: (1) Plaintiffs' claim was time-barred underS 338(d) of the California Code of Civil Procedure; and (2) Plaintiffs failed to raise a triable issue of fact on the reliance element of the claim. We have jurisdiction pursuant to 28 U.S.C. S 1291, and we affirm.
 
 I. BACKGROUND
 
 2
 Nodine was diagnosed with congestive heart failure in July, 1986. Nodine's family doctor referred her to a cardiologist, Dr. Joseph R. Dorchak, who, in turn, referred her to a surgeon, Dr. Joe R. Utley. The doctors told Nodine that she needed to have a heart valve replacement or she would die within three to six months. Dr. Utley discussed various options for artificial valves with Nodine. Dr. Utley had to decide whether Nodine would be implanted with a pig tissue valve, which he opined "would probably have to be replaced within five to ten years," or with the mechanical BSCC valve, which he said would probably last "30 to 40 years or a lifetime." Dr. Utley did not discuss any mechanical valves other than the BSCC valve with Nodine. According to Dr. Dorchak, Nodine expressed no preference regarding which valve to implant.
 
 
 3
 The BSCC valve was implanted in Nodine's heart on July 24, 1986. The surgery was successful, and there is no evidence that the valve malfunctioned in any way during the time it was implanted. In 1990, plaintiffs learned that some BSCC valves contained a defective outlet strut mechanism. The strut mechanism fractured in a number of valves, resulting, in most instances, in the death of those patients. Allegedly, "[t]hese fractures were the result of both the [BSCC valve ] design and poor manufacturing processes. In particular, the valves [allegedly] suffered from poor welding and poor quality control." Michael v. Shiley, Inc., 46 F.3d 1316, 1320 (3d Cir. 1995), overruled on other grounds by Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996). In September, 1993, plaintiffs participated in a settlement of claims related to anxiety associated with the knowledge of having a possibly defective BSCC valve. The 1993 settlement agreement included the following provision:
 
 
 4
 Subject to the remainder of this Paragraph, the term "BSCC Claims" shall mean any and all claims of injury, loss, or compensatory or punitive damage deriving from or related to any alleged defect in or alleged representation, misrepresentation, or omission concerning any Bjork-Shiley Convexo-Concave prosthetic heart valve ("BSCC Valve"), including, without limitation, all such claims deriving from or related to implantation, use, replacement or removal prior to the execution hereof, including any alleged loss of consortium related thereto. BSCC Claims do not include any future claims for compensatory or punitive damages injury, loss or damage deriving from or related to personal injuries or death, whatever the legal theoryupon which such future claim is based, caused by (a) future mechanical failure (which includes but is not limited to strut fracture, disc fracture, or other valve malfunction) of a BSCC Plaintiff's implanted BSCC Valve (whether due to a previously existing defect or otherwise), other than alleged emotional distress (or claims similar thereto or arising therefrom under any legal theory) relating to fear of fracture of a working valve prior to such failure or removal. "Future" as used in this Para graph means after the date of execution of this Con fidential Master Settlement Agreement.
 
 
 5
 The settlement agreement contains no language that expressly preserves or waives defenses to future suits, including statute of limitations defenses.
 
 
 6
 Nodine remained anxious about her BSCC valve after the 1993 settlement. She repeatedly visited her doctors to discuss information she had heard about problems with the BSCC valve. Nodine subsequently decided to have the BSCC valve explanted. Dr. Steven Leyland testified that "emotional issues were ultimately the swaying factor, . . . in deciding surgery," and that he would categorize Nodine's valve replacement as elective. Nodine's surgery took place on January 15, 1997, and the explantation was successful. Plaintiffs filed this lawsuit shortly thereafter.
 
 
 7
 Plaintiffs' complaint included claims for negligence, breach of express and implied warranty, strict liability, loss of consortium, and fraud and deceit. Unfortunately, the BSCC valve disappeared on the way to a metallurgist for testing and has never been recovered. As a result, the district court ruled that the BSCC valve could not be offered as evidence at trial. Because of the loss of the valve, plaintiffs conceded that they were unable to prove their product defect claims. See Khan v. Shiley Inc., 266 Cal. Rptr. 106, 110 (Ct. App. 1990) ("[P]roof that the product has malfunctioned is essential to establish liability for an injury caused by [a] defect."). Accordingly, summary judgment was entered against plaintiffs on all product defect claims. Plaintiffs do not challenge that ruling on appeal.[1]
 
 
 8
 Plaintiffs' fraud claim was also hampered by events beyond their control. Dr. Utley, the surgeon who implanted Nodine's BSCC valve in 1986 and who was also the primary decisionmaker regarding its selection, became seriously ill and, as a result, could not be deposed. The district court inquired into whether Dr. Utley might be able to testify later, if the case were stayed. Ultimately, however, it declined to stay the action because it found other issues to be dispositive and granted summary judgment for Shiley on the alternative grounds that the fraud claim was time-barred and that plaintiffs had failed to show reliance.
 
 II. STANDARD OF REVIEW
 
 9
 A grant of summary judgment is reviewed de novo. See Wright v. Riveland, 219 F.3d 905, 919 (9th Cir. 2000). "Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). " Adcock v. Chrysler Corp., 166 F.3d 1290, 1292 (9th Cir. 1999). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. See Wright , 219 F.3d at 919. Summary judgment is not proper if material factual issues exist for trial. See B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999).
 
 III. DISCUSSION
 
 10
 California allows a cause of action for fraud when a manufacturer of a product conceals material product information from potential users regardless of whether the product has yet malfunctioned. See Khan, 266 Cal. Rptr. at 112. In a heart-valve case, such a claim is possible even where the valve in question is not available as evidence:
 
 
 11
 For purposes of establishing fraud, it matters not that the valve implanted in [plaintiff's] heart is still functioning, arguably as intended. Unlike the other theories, in which the safety and efficacy of the product is assailed, the fraud claim impugns defendants' conduct.
 
 
 12
 The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false rep resentation, concealment or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.
 
 
 13
 Id. (internal quotation marks and citation omitted).
 
 
 14
 Plaintiffs' fraud claim is subject to a one-year statute of limitations.[2] See Cal. Civ. Proc. Code S 340(3). Under California law, the statute of limitations ordinarily begins to run on tort actions when the last element essential to a cause of action occurs. See San Francisco Unified Sch. Dist. v. W.R. Grace & Co., 44 Cal. Rptr. 2d 305, 309 (Ct. App. 1995).
 
 
 15
 California courts apply the "discovery rule" to determine when a claim accrues under S 340(3). See Clark, 100 Cal. Rptr. 2d at 227. "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." Id. (emphasis omitted).
 
 
 16
 In this case, plaintiffs previously settled claims for misrepresentations and omissions connected with the BSCC valve in 1993. At that time, plaintiffs not only had sufficient notice of the fraud to file suit, but also incurred damages sufficient to induce Shiley to enter into the settlement agreement. Although these damages may not have accounted for the explantation itself, they arose from the same alleged acts of fraud upon which plaintiffs' claim is now based. The discovery rule is thus satisfied.
 
 
 17
 Plaintiffs, however, argue that because (1) Nodine did not know at the time of the settlement agreement that her BSCC valve would have to be explanted, and (2) the delay before the 1997 surgery was "medically and legally reasonable," the statute of limitations did not begin to run until the explantation. In essence, plaintiffs argue that a whole new fraud took place when the new damages element -the explantation -occurred. This is not the law in California. Rather,
 
 
 18
 where an injury, although slight, is sustained in con sequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the dam ages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.
 
 
 19
 Spellis v. Lawn, 246 Cal. Rptr. 385, 389 (Ct. App. 1988) (internal quotation marks and citations omitted).
 
 
 20
 The settlement agreement addresses the same tort alleged in this case, albeit additional damages (or injuries) are also alleged here. Plaintiffs, however, cannot revive the statute of limitations by claiming they incurred new damages as a result of the old fraud. See Clark, 100 Cal. Rptr. 2d at 228 ("a single tort can be the foundation for but one claim of damages"). Under S 340(3)'s one-year limitations period, therefore, the statute of limitations on plaintiffs' fraud claim would have run by 1994, at the latest. The fraud claim is thus time barred.[3]
 
 
 21
 Plaintiffs further argue that because the settlement agreement "expressly preserved" claims arising from the "future mechanical failure" or "future removal" of an implanted valve, Shiley necessarily waived future statute of limitations defenses related to such claims. The district court, however, found that the plain language of the agreement merely clarifies that such claims, if brought, would not be precluded by the settlement agreement. It held that the settlement agreement does not exempt those claims from the relevant statute of limitations or waive any other defenses that might be available.
 
 
 22
 We agree. The language quoted by plaintiffs to support their claim that the settlement agreement "expressly preserved future claims" merely states that "[settled ] claims do not include" any future claims. Moreover, the language excluding future claims for valve malfunction or explantation from the settlement agreement does not constitute an implied waiver of the statute of limitations defense in regard to future fraud claims. While the unambiguous language of the settlement agreement expressly preserves product defect and negligence claims resulting from an explantation,[4] plaintiffs' fraud claim does not fit within the exempted category defined in the settlement agreement; therefore, it cannot be classified as a future claim. Accordingly, because the settlement agreement could not lead an ordinary person to believe that future fraud claims arising out of valve explantation would be preserved, Shiley did not implicitly waive the statute of limitations defense.[5]
 
 IV. CONCLUSION
 
 23
 Because the applicable statute of limitations for Khan-type fraud had commenced to run more than one year before the action was commenced, and Shiley did not waive the statute of limitations for fraud claims in the settlement agreement, plaintiffs' fraud claim is time-barred.[6]
 
 
 24
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable William Alsup, United States District Judge for the Northern District of California, sitting by designation.
 
 
 [1]
 The dissent proceeds to analyze the settlement agreement as if product defect claims, including death claims, for "future mechanical failure," are still a part of this case. As indicated above, they are not and we do not opine on the effect of the settlement agreement on them.
 
 
 [2]
 The district court found Appellants' claim was time-barred under the three-year statute, Cal. Civ. Proc. Code S 338. The California Court of Appeal, however, has recently held that the applicable statute of limitations for fraudulent concealment claims in personal injury actions is Cal. Civ. Proc. Code S 340(3) (one year), not Cal. Civ. Proc. S 338 (three years). See Clark v. Baxter Healthcare Corp., 100 Cal. Rptr. 2d 223, 226 (Ct. App. 2000). Therefore, although we come to the same conclusion as the district court, we apply the one-year limitations period, rather than the three-year period.
 
 
 [3]
 In making its policy argument as to why plaintiffs' fraud claim should not be barred, the dissent completely ignores governing California law, particularly Khan, 266 Cal. Rptr. 106, under which the claim accrued, and was compensated, at the time of the 1993 settlement agreement. For this reason, as explained below, plaintiffs' fraud claim cannot be a "future" claim as described in the settlement agreement.
 
 
 [4]
 A statute of limitations waiver would be superfluous here because the limitations period would not begin to run until the time of the injury when damages were suffered; in this case, at the time of explantation.
 
 
 [5]
 The fact that the future claims provision of the settlement agreement includes the language, "whatever the legal theory upon which such a future claim is based," is of no significance. Plaintiffs' fraud claim is not a "future claim" under the settlement agreement. Therefore, because this qualifying language applies only to future claims, it does not preserve plaintiffs' fraud claim.
 
 
 [6]
 Because we find the statute of limitations issue dispositive, we do not reach the reliance issue.
 
 
 ALSUP, District Judge, dissenting:
 
 25
 I would reverse.
 
 
 26
 In product liability cases involving the health and well being of Americans, such as exposure to carcinogens, or, as here, reliance on possibly defective heart valves, a primary settlement difficulty is the inability to predict whether any given claimant will, in the future, suffer cancer or heart failure or similar harm. In the meantime,however, all victims may suffer anxiety over fear of catastrophe. Such cases, therefore, are typically settled by compensating immediately for all emotional distress (as well as any hard economic losses incurred to date) and leaving for the future any claim for cancer or heart failure or a similar such event should it actually occur. This model is a practical means of closing thousands of individual claims, for very few claimants ever really need to call on the second half of the settlement formula. If they do, then a future remedy is available.
 
 
 27
 The present case and settlement at issue were based on that model. Regrettably, however, the panel opinion denies the Nodines the benefit of the second half of the settlement formula. Parting company with the panel, I would construe the agreement as clearly carrying out the conventional model described. Here is why.
 
 
 28
 The key paragraph in the settlement agreement stated:
 
 
 29
 B. Subject to the remainder of this Paragraph, the term "BSCC Claims" shall mean any and all claims of injury, loss, or compensatory or punitive damage deriving from or related to any alleged defect in or alleged representation, misrepresentation, or omission concerning any Bjork-Shiley Convexo-Concave prosthetic heart valve ("BSCC Valve"), including, without limitation, all such claims deriving from or related to implantation, use, replacement or removal prior to the execution hereof, including any alleged loss of consortium related thereto. BSCC Claims do not include any future claims for compensatory or punitive damages injury, loss or damage deriving from or related to personal injuries or death, what ever the legal theory upon which such future claim is based, caused by (a) future mechanical failure (which includes but is not limited to strut fracture, disc fracture, or other valve malfunction) of a BSCC Plaintiff's implanted BSCC Valve, or (b) future removal of a BSCC Plaintiff's implanted BSCC Valve (whether due to a previously existing defect or otherwise), other than alleged emotional distress (or claims similar thereto or arising therefrom under any legal theory) relating to fear of fracture of a working valve prior to such failure or removal."Fu ture" as used in this Paragraph means after the date of execution of this Confidential Master Settlement Agreement.
 
 
 30
 (App. 60-61) (emphasis added). Significantly, as shown, this provision stated that the released claims did not include "any future claims for compensatory or punitive damages injury, loss or damage deriving from or related to personal injuries or death, whatever the legal theory upon which such future claim is based, caused by future mechanical failure or future explantation of the device (other than claims for alleged emotional distress prior to such failure or removal).
 
 
 31
 Very explicitly, then, the agreement contemplated that "future" claims of the types described could be later brought. Any reasonable claimant would have so understood it. Since the whole point of such a reservation was to deal later with feared problems if and when they ever arose, it would not have occurred to the reasonable reader that the contemplated "future" event and lawsuit all had to occur within a limitations period that had already started to tick -and indeed might already have expired -by the time of the settlement itself.
 
 
 32
 The most graphic illustration of this is in the case of death. "Future" claims for "death" from "future mechanical failure" were preserved. Did this mean that the victim of mechanical failure had to die within any remainder of the limitations period in order to assert a fraud lawsuit? No one would reasonably have so understood the language. Rather, all reasonable readers would have understood it to mean that if a consumer of the valve in question died as a result of a future mechanical failure, then the claim was preserved regardless of how long after the release the failure occurred.
 
 
 33
 So too with explantation, Ms. Nodine's case. The express language allowed her to sue for "personal injuries" due to "future removal" and to do so "whatever the legal theory." At the time of the settlement, Ms. Nodine could not have reasonably understood the words to mean that she had to undergo the explantation and to sue all before expiration of the short balance, if any, remaining on an earlier limitations period. Rather, any reasonable and objective reader would have understood it to mean that she could wait and see, monitor the valve's performance, and with the ongoing advice of her doctor, decide whether and if so when to undergo the pain and risk of any explantation.
 
 
 34
 A sleeves-from-your-vest quality permeates the defendants' argument. Defendants admitted at oral argument that, under their views of the law and agreement, the limitations period could well have already run by the time of the settlement itself. This is because Ms. Nodine's fraud claim would have been based on the original misrepresentation that persuaded her to implant their product in her chest in the first place. But since the specified contingencies in the "future " had not yet occurred (and might never occur), Ms. Nodine could not have reasonably thought, when she made the release, that the time for assenting her "future" cause of action,"whatever the legal theory," had already come and gone.
 
 
 35
 Another paragraph of the settlement agreement (App. 69 P 21) provided additional protection to residents of Canada and provided that if they later experienced "a strut fracture," they would have a standing offer from Pfizer to settle for $200,000 U.S. without prejudice to their right "to file an action on such claim in lieu of accepting the above offer." Has this standing offer also been eclipsed by an unreferenced statute of limitations? Has the right to "file an action" also been superseded? No one would have reasonably thought so when they signed the release in question.
 
 
 36
 In light of the foregoing, I would hold that the agreement itself expressly recognized the availability of "future" specified claims and that at least as to those future claims implicitly recognized that no limitations period would begin to run until the "future mechanical failure" or "future removal."
 
 
 37
 How many extant agreements or product claims will be eviscerated by today's panel decision is unclear but it will be many. Victims in these cases (and other BSCC plaintiffs) had better consult with their counsel as to whether to file protective actions to toll whatever time remains, if any, on the limitations period. Future agreements, counsel will now see, will have to provide even more explicit protection from the statute of limitations in order to make the conventional settlement model viable.
 
 I respectfully dissent