**In re: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

This document relates to: *Orange County Water Dist. v. Unocal Corp., et al.,* 04 Civ. 4968

No. 1:00B1898.
MDL No. 1358(SAS).
No. M 21–88.

United States District Court,
S.D. New York.

Dec. 14, 2006.

Michael D. Axline, Tracy O'Reilly, Miller, Axline & Sawyer, Sacramento, CA, for Orange County Water District.

Robin Greenwald, Robert Gordon, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs.

Peter John Sacripanti, James A. Pardo, McDermott Will & Emery LLP, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

In this consolidated multi-district litigation ("MDL"), plaintiffs seek relief from contamination, or threatened contamination, of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol ("TBA"), which is a product formed by the natural degradation of MTBE in water. The parties have already engaged in extensive motion prac-

tice, and familiarity with the Court's previous opinions is assumed.[1] The facts underlying these cases are comprehensively set out in those opinions.[2]

Defendants now seek summary judgment on plaintiff Orange County Water District's ("OCWD") claims for strict products liability, negligence, permanent trespass, permanent nuisance, violation of the OCWD Act, as well as its claim for declaratory relief, on the ground that all of those claims are time-barred.[3]

## II. BACKGROUND

### A. Orange County Water District

OCWD is a "special water agency" created by statute and charged with the responsibility to "maintain, replenish, and manage groundwater resources" within its geographic area.[4] By its enabling Act, OCWD is statutorily authorized to "prevent interference [with] ... [or] diminution ... [or] pollution or contamination" of the water supply within the district.[5] The Act also empowers OCWD to "conduct any investigations of the quality of the surface and groundwaters within the district ... to determine whether those waters are contaminated or polluted" and to "expend available funds to perform any cleanup, abatement, or remedial work required under the circumstances."[6]

### B. MTBE Contamination Within the District

OCWD became acquainted with MTBE contamination in 1995. Documents from

---

**1.** *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 457 F.Supp.2d 455 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.,* 458 F.Supp.2d 149 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.,* 447 F.Supp.2d 289 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.,* 438 F.Supp.2d 291 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.,* 457 F.Supp.2d 324 (S.D.N.Y.2006); *In re MTBE Prods. Liab. Litig.,* 457 F.Supp.2d 298 (S.D.N.Y.2006), *motion for reconsideration denied,* 2006 WL 1816308 (June 26, 2006); *In re MTBE Prods. Liab. Litig.,* 415 F.Supp.2d 261 (S.D.N.Y. 2005); *In re MTBE Prods. Liab. Litig.,* 399 F.Supp.2d 340 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* 399 F.Supp.2d 325 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 1529594 (S.D.N.Y. June 28, 2005); *In re MTBE Prods. Liab. Litig.,* No. M21–88, MDL 1358ES, 2005 WL 1500893 (S.D.N.Y. June 24, 2005); *In re MTBE Prods. Liab. Litig.,* 402 F.Supp.2d 434 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* 399 F.Supp.2d 242 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* 233 F.R.D. 133 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* 379 F.Supp.2d 348, 364 (S.D.N.Y.2005); *In re MTBE Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan.18, 2005); *In re MTBE Prods. Liab. Litig.,* No. M21–88, MDL 1358, 2005 WL 39918 (S.D.N.Y. Jan.6, 2005); *In re MTBE Prods. Liab. Litig.,* 364 F.Supp.2d 329 (S.D.N.Y.2004); *In re MTBE Prods. Liab. Litig.,* 361 F.Supp.2d 137 (S.D.N.Y.2004) ("*MTBE VI*"); *In re MTBE Prods. Liab. Litig.,* 341 F.Supp.2d 386 (S.D.N.Y.2004) ("*MTBE V*"); *In re MTBE Prods. Liab. Litig.,* 341 F.Supp.2d 351 (S.D.N.Y.2004) ("*MTBE IV*"); *In re MTBE Prods. Liab. Litig.,* 342 F.Supp.2d 147 (S.D.N.Y.2004) ("*MTBE III*"); *In re MTBE Prods. Liab. Litig.,* 209 F.R.D. 323 (S.D.N.Y.2002) ("*MTBE II*"); *In re MTBE Prods. Liab. Litig.,* 175 F.Supp.2d 593 (S.D.N.Y.2001) ("*MTBE I*").

**2.** For a thorough recitation of plaintiffs' fact allegations see, for example, *In re MTBE Prods. Liab. Litig.,* 379 F.Supp.2d at 364–67.

**3.** *See* Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Based on the Statute of Limitations ("Def.Mem.") at 1. Defendants do not challenge, in the current motion, OCWD's "claims to the extent they are based upon a theory of continuing trespass or nuisance." *Id.* at n. 7. *See also id.* at 20.

**4.** OCWD's Second Amended Complaint ("Compl.") ¶ 4. *See also* OCWD Act, California Water Code § 40–2(6).

**5.** OCWD Act, California Water Code § 40–2(9).

**6.** *Id.* § 40–8(a) and (b).

that time show that OCWD's chief hydrogeologist was informed by an employee of the Santa Ana Regional Water Quality Control Board ("RWQCB") that MTBE might become the "next big deal" and that it "seems to not degrade, retard, etc. and is reportedly a known carcinogen."[7] Soon after, OCWD began systematic testing for MTBE contamination of the groundwater within its district.[8] Although there was no state or federal requirement to test for MTBE, OCWD believed "proactive monitoring [would] enable[ ] OCWD to predict and prevent *potential* problems."[9]

At that time, OCWD's knowledge of MTBE as a contaminant was limited.[10] It knew that MTBE posed a potential problem and that it had particular characteristics which might make it an especially troubling contaminant, but had only begun regularly testing for the contaminant since 1995.[11] The record suggests that OCWD did not, at that time, consider the presence of low levels of MTBE *itself* to be a signifi-

cant problem beyond being an early indicator of further possible contamination and presenting a concern relating to public perception.[12]

Agenda notes from a 1997 OCWD meeting show that by that date it was clearly concerned about the threat of MTBE. The notes state that MTBE had been detected "with increasing frequency in groundwater and municipal supply wells" generally, and that the City of Santa Monica had recently been forced to shut down a majority of its production wells due to MTBE contamination.[13] The agenda notes also state that "[a]lthough an examination of all major production wells in Orange County did not reveal such contamination," MTBE had been detected in "several monitoring and irrigation wells" within the district.[14] Further, the agenda notes indicate that OCWD was aware that state standards for MTBE were not necessarily congruent with taste and odor thresholds: "The current 'action level' for MTBE in California

---

7. 4/3/95 Email from Roy Herndon to Various Recipients, Ex. 2 to Declaration of Melanie Sartoris, defendants' counsel, in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Sartoris Decl."), at 1.

8. *See* Plaintiff's Rule 56.1 Statement in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Pl.56.1") ¶ 6. *See also* 1/12/06 Deposition of Steve Fitzsimmons, OCWD's lab director, Ex. 3 to Sartoris Decl. ("Fitzsimmons Dep."), at 72, 80–82, 92–93 (discussing implementation in 1995 of regular system-wide testing for MTBE).

9. Pl. 56.1 ¶ 8 (quoting 2/29/96 OCWD Bulletin, Facts About MTBE, Ex. 12 to Declaration of Michael Axline, plaintiff's counsel, in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Axline Decl.")).

10. OCWD was already familiar with the compound because it was used as a solvent in its laboratory. *See* 4/4/95 Email from Fitzsim-

mons to Various Recipients, Ex. 2 to Sartoris Decl., at 2.

11. *See* 4/3/95 Email from Herndon to Various Recipients, Ex. 2 to Sartoris Decl., at 1 ("Ken [Williams at RWQCB] thinks MTBE may already be in deeper aquifers, but we just don't know without having sampled for it.").

12. *See, e.g.,* 4/2/96 Email from Herndon to Various Recipients, Ex. 2 to Sartoris Decl., at 6 (discussing another water district's experience with low level detections of 0.6 and 1 ppb, and noting "it is too bad that their perception of public opinion is such that costly treatment of such low level VOC [volatile organic compound] concentration could be necessary. . . . [W]hen does cost become an issue when quality is well within [Department of Health Services] standards, but the public perception warrants additional expenditures?").

13. 4/16/97 Agenda Item Submittal, Ex. 1 to Sartoris Decl.

14. *Id.*

is 35 micrograms/L, *but recent studies by OCWD and elsewhere* have demonstrated that many people can smell or taste this gasoline compound at concentrations as low as 10–20 micrograms/L."[15]

Increasingly, OCWD also became involved in the public movement to ban MTBE as a gasoline additive. In 1998, its Board of Directors passed a resolution calling for a ban within two years.[16] OCWD publicly advocated against the use of MTBE by offering free MTBE "information kits" to the public, and by encouraging community members to petition for the clean-up of MTBE.[17] By 1999, OCWD characterized itself as having taken "a leadership position" in the movement to ban MTBE as a gasoline additive.[18]

During these years, OCWD continued to regularly test and analyze groundwater within the district for the presence of MTBE.[19] As a result, OCWD detected the presence of MTBE hundreds of times in a variety of locations across the district.[20] Additionally, because OCWD believed that the presence of MTBE largely resulted from leaking underground storage tanks ("USTs"), it sought to track reported leaks within the district.[21] Ultimately, OCWD brought the instant lawsuit on May 6, 2003, having identified over four hundred release sites which it alleges are now "contaminating and threatening the water supplies" of the district.[22]

## III. APPLICABLE LAW

### A. Legal Standard

Summary judgment is only appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[23] An issue of fact is genuine if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'"[24] while a fact will be deemed material where it

---

15. *Id.* (emphasis added). The agenda further noted that "[e]ven if the compound is deemed safe at these levels, municipalities may still find it necessary to remove such traces of MTBE in order to alleviate consumer dissatisfaction." *Id.*

16. *See* 7/29/99 Press Release, OCWD Announces Its History With MTBE, Ex. 13 to Axline Decl., at 1.

17. *See id.* at 2.

18. 3/25/99 Letter from William Mills, Jr., OCWD General Manager, to Orange County Register, Ex. 10 to Axline Decl., at 1.

19. *See* Pl. 56.1 ¶ 9.

20. *See, e.g.,* OCWD, Detection of MTBE at Large and Small Water System Wells, January 1997 to June 1998, Ex. 10 to Sartoris Decl. (showing MTBE detections at various locations). Plaintiff argues that defendants improperly seek to show that detections were "widespread and ubiquitous" by including detections from a number of "non-well" sources. Pl. Mem. at 11. *See also* Pl. 56.1 ¶ 11. Nevertheless, even when all non-well detections are excluded, the data still shows that MTBE detections were not uncommon. *See* Defendants' Response to Pl. 56.1 ("Def.Rep.56.1") ¶ 11 (noting 240 MTBE detections in 85 wells over six-month period). *See also* Plaintiff's Supplemental Responses to Defendants' Preliminary Interrogatories Regarding Standing, Ex. 7 to Declaration of David Schraeder, defendants' counsel, in Support of Defendants' Motion for Summary Judgment of Plaintiff's Claims Based on MTBE Detections Below the Secondary MCL (listing wells with MTBE detections).

21. *See, e.g.,* 9/23/96 Letter from Yvonne Shen, OCWD Laboratory Director, to Gerard Thibeault, RWQCB employee, Ex. 7 to Sartoris Decl., at 15 (requesting information on "leaky USTs" to "provide us early warnings or predictions" of likely contamination).

22. Compl. ¶ 5. After filing its Complaint, plaintiff identified more than one hundred additional release sites.

23. Fed.R.Civ.P. 56(c).

24. *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir.2006) (quoting *Stuart v. American Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir.1998)).

" 'might affect the outcome of the suit under the governing law.' " [25] Further, even though plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that plaintiff can prove no set of facts in support of its claims which would entitle it to relief, or if the claim is not legally feasible.[26]

The moving party bears the burden of demonstrating that there exists no genuine issue of material fact.[27] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact that does " 'not rely on conclusory allegations or unsubstantiated speculation.' " [28] To do so, it must do more than show that there is " 'some metaphysical doubt as to the material facts.' " [29] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[30]

### B. California's Statute of Limitations

■ Each of OCWD's claims at issue here is governed by the three-year statute of limitation found in section 338 of the California Code of Civil Procedure.[31] The limitations period begins running when a plaintiff's cause of action accrues.[32] In California, a plaintiff will be deemed to have suffered injury sufficient to give rise to a cause of action when it has suffered some "appreciable and actual harm." [33] Although the harm incurred must be more than nominal, a plaintiff need not have ascertained the full scope of its injury and " 'neither the speculative nor uncertain character of the damages nor the difficulty of proof will toll the period of limitation.' " [34]

■ However, the limitation period may be tolled by the discovery rule, under which a cause of action will not accrue until a plaintiff either actually discovers its injury or should have discovered its injury "through the exercise of reasonable diligence." [35] In determining whether a plaintiff has or should have discovered its injury, California courts consider both the plaintiff's "actual knowledge as well as knowledge that could reasonably be discovered through the investigation of

**25.** *Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**26.** *See Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir.2006).

**27.** *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005).

**28.** *Id.* (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001)).

**29.** *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**30.** *See id.* (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505).

**31.** *See* California Code Civ. Proc. § 338(a) (claims "created by statute" must be commenced within three years); *id.* § 338(b) (claims for "trespass or injury to real property" must be commenced within three years). *See, e.g., Wilshire Westwood Assocs. v. Atlantic Richfield Co.*, 20 Cal.App.4th 732, 24 Cal. Rptr.2d 562 (Cal.Ct.App.1993).

**32.** *See San Francisco Unif. Sch. Dist. v. W.R. Grace & Co.*, 37 Cal.App.4th 1318, 1326, 44 Cal.Rptr.2d 305 (Cal.Ct.App.1995) ("statute of limitation commences when the last element essential to the cause of action occurs").

**33.** *Id.*

**34.** *Id.* (quoting *Davies v. Krasna*, 14 Cal.3d 502, 516, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975)).

**35.** *Id.*

sources open to [the plaintiff]."[36] Generally, a plaintiff "need not be aware of the specific 'facts' necessary to establish the claim,"[37] and once a plaintiff "has a suspicion of wrongdoing" it will be deemed to have discovered its injury.[38]

## IV. DISCUSSION

### A. Site–by–Site Analysis

■ Defendants argue that OCWD cannot seek to avoid the application of the statute of limitations "by splintering [its] lawsuit into hundreds (or more) of 'site-by-site' causes of action,"[39] suggesting that such an approach is prohibited by California law, and that the "resulting factual complexities will prevent any meaningful application" of the statute.[40] Defendants' argument that California courts do not permit a site-by-site analysis is simply wrong. Indeed, the California Court of Appeals has held that the "factual question of when [asbestos] contamination occurred must be determined on a building-by-building basis."[41]

While a site-by-site approach is undoubtedly more complicated, such an analysis is required given that OCWD alleges injuries at "multiple locations, in multiple aquifers, and at different points in time."[42] The question of when (and whether) each release caused the alleged injury of which OCWD complains will require an analysis of factual circumstances specific to each release site (*e.g.*, the amount and duration of the spill) and the location of the injury (*e.g.*, type of aquifer, level of contamination), and therefore must be determined on a site-by-site basis.

The conduct and harm on which OCWD's claims are based may be grouped as follows: (1) conduct and harm both occurring prior to May 6, 2000; (2) conduct prior to May 6, 2000 but harm occurring after May 6, 2000; and (3) conduct and harm both occurring after May 6, 2000. Claims arising from the first group are barred by the statute of limitations, unless OCWD can show that the harm was not reasonably discoverable when it occurred. Claims arising from the second and third groups are not time-barred be-

---

**36.** *City of Santa Clara, et al., v. Atlantic Richfield Co., et al.*, 137 Cal.App.4th 292, 317, 40 Cal.Rptr.3d 313 (2006) (citing *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1109, 245 Cal.Rptr. 658, 751 P.2d 923 (1988)).

**37.** *Jolly*, 44 Cal.3d at 1111, 245 Cal.Rptr. 658, 751 P.2d 923.

**38.** *City of Santa Clara*, 137 Cal.App.4th at 317, 40 Cal.Rptr.3d 313 (citing *Jolly*, 44 Cal.3d at 1109, 245 Cal.Rptr. 658, 751 P.2d 923) ("So long as a suspicion exists, it is clear that the plaintiff must go find the facts.").

**39.** Defendants' Reply Memorandum in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Def.Rep.Mem.") at 1.

**40.** *Id.* at 2.

**41.** *San Francisco Unif. School Dist.*, 37 Cal. App.4th at 1336, 44 Cal.Rptr.2d 305. None-

theless, defendants rely on *City of San Diego v. United States Gypsum Co.*, 30 Cal.App.4th 575, 35 Cal.Rptr.2d 876 (Cal.Ct.App.1994), which rejected a building-by-building approach in determining whether the City's claim for asbestos contamination in city-owned buildings was timely. In that case, however, the court concluded that because the City had argued that it suffered appreciable harm starting with the sale and installation of the asbestos-containing building material, it could not later argue that, as to some buildings, it only suffered appreciable harm when the asbestos was released. *See id.* at 584, 35 Cal.Rptr.2d 876 ("Moreover, the trial court properly rejected [the] City's argument concerning its causes of action on a building-by-building and product-by-product basis because [the] City's admissions of continuing injury since installation and sale ... establish 'appreciable and actual harm' beyond the three-year limitations period.").

**42.** Pl. 56.1 ¶ 3.

cause the harm occurred—and therefore OCWD's cause of action accrued—within the limitations date. With these principles in mind, the more difficult task is determining into which group OCWD's claims fall—*i.e.*, when did OCWD suffer "appreciable harm" from the specific releases on which it bases its claims.

## B. Appreciable Harm

██ This motion requires the Court to confront the vexing issue of when the release of MTBE-blended gasoline within the district causes OCWD to suffer appreciable harm. There are three possibilities: (1) when MTBE-blended gasoline was released; (2) when MTBE was detected in the groundwater; or (3) when the presence of MTBE in the groundwater caused or should have caused OCWD to take some action.

The mere release of MTBE-blended gasoline does not cause OCWD appreciable harm. Rather, it is only when a gasoline plume travels from the release point through the soil and actually enters the aquifer that appreciable harm could occur. Thus, there is no appreciable harm until MTBE is *present* in the groundwater. Yet, even so, not every detection of MTBE results in a *contamination* of the groundwater. The exposure to MTBE may be fleeting. Or, the levels of MTBE present in the groundwater may be sufficiently de minimis such that OCWD did not suffer appreciable harm. In an earlier decision, this Court rejected the Maximum Contaminant Level ("MCL") as defining what is and is not an injury.[43] But in permitting contamination below the MCL to constitute an injury, this Court made clear that not every detection necessarily results in an injury.[44] While this Court need not—and indeed, on this record cannot—determine with specificity what level of contamination constitutes appreciable harm as a matter of law, OCWD clearly suffered appreciable harm when the level of contamination at a particular location caused OCWD to act, or reasonably should have caused it to act, in response to the contamination.

## C. Releases Occurring and Resulting in Appreciable Harm Prior to May 6, 2000

The vast majority of the releases at issue here occurred prior to the limitations date. Of the more than five hundred release sites identified by OCWD as a threat to the district's groundwater, approximately ninety-percent occurred prior to May 6, 2000.[45] Evidence in the record reveals

---

**43.** *See In re MTBE Prods. Liab. Litig.,* 458 F.Supp.2d 149 (S.D.N.Y.2006).

**44.** *See id.* at 157.

**45.** *See* Declaration of William Costley, defendants' paralegal, in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Costley Decl."), ¶¶ 4–6. OCWD objects to the defendants' declaration, arguing that the declarant "lacks personal knowledge and fails to lay a proper foundation for the recitations in the declaration." Plaintiff's Objections to Costley Decl. ("Pl.Obj.") at 1. OCWD's objection fails because public records "do[ ] not require any foundational testimony" from a qualified witness to be admissible. *United States v. Doyle,* 130 F.3d 523, 546 (2d Cir.1997). Here, defendants' declaration purports to summarize various "public records"—specifically, listings of known UST release sites produced by the RWQCB under statutory requirement, an MTBE detection database maintained by a RWQCB employee, and various "site files" maintained by the RWQCB, other regional water authorities, and the Orange County Health Care Agency. *See* Defendants' Reply to Pl. Obj. at 2. These records are admissible as "public records" under Rule 803(8)(c) of the Federal Rules of Evidence as they are the result of the agencies' factual investigation of matters within their statutory authority and OCWD offers no evidence to indicate a lack of trustworthiness. *Cf. Hickson Corp. v. Norfolk Southern Ry. Co.,* 124 Fed.Appx. 336, 345 (6th Cir.2005) (finding agency records summarizing reports received from third parties inadmissible where objecting party satisfied

that OCWD was likely aware of most of these releases as early as 1999.[46] Defendants argue that this kind of information, and OCWD's own experience with MTBE, together were sufficient to "place[ ] OCWD on notice that the alleged MTBE/TBA contamination in its territory had reached a magnitude and scope not appreciably different from that which exists today and is the basis of OCWD's lawsuit."[47] Thus, defendants argue that claims relating to these releases must be time-barred.

OCWD disclaims any reliance on the discovery rule to toll the limitations period.[48] Instead, it argues that it is "seeking damages only for 'appreciable harm' that occurred subsequent to May 6, 2000."[49] OCWD argues that although it may have been aware of the releases, they *had not yet caused any appreciable harm:* "The District's awareness of improper discharges and contamination of shallow non-pota-

ble aquifers, however, did not create a cause of action."[50] Pointing to the hydrogeological features of the district's groundwater basin, OCWD argues that although such contamination may have posed a future threat to the groundwater, it did not cause "appreciable harm" sufficient to trigger the limitations period.[51] It further argues that "[e]xtensive investigation and testing on a site-by-site basis is a necessary prerequisite to discovering whether appreciable harm has occurred at particular locations."[52]

Whether a claim is time-barred turns, in part, on the nature of OCWD's alleged injuries. OCWD's Complaint is not limited to injuries arising from contamination of the deep aquifers or of the drinking water. Rather, OCWD alleges that it "has suffered injury in fact" both "as a result of MTBE and/or TBA contamination and threat of contamination in wa-

---

burden of showing summaries to be untrustworthy).

**46.** In 1999, the RWQCB distributed a listing of known UST release sites, which included over four hundred sites in the district. *See* 4/5/99 Letter from Kenneth Williams, RWQCB, to Public Water Agencies Mailing List, Ex. 11 to Sartoris Decl. OCWD argues that there is no evidence that it "actually received the letter" because there is "no stamp or other marking" indicating receipt. Pl. 56.1 ¶ 29. This argument is unpersuasive. The document was produced by OCWD through discovery in the course of this litigation. *See* Def. Rep. 56.1 ¶ 29. Moreover, such listings were required to be provided to water agencies such as OCWD, by statute, and OCWD admits that it did periodically receive the listings. *See* Pl. 56.1 ¶¶ 20, 26. *See also* Def. Rep. 56.1 ¶ 29 (discussing plaintiff's admissions).

**47.** Def. Mem. at 7.

**48.** *See* Pl. Mem. at 3 ("Knowledge is only relevant to the statute of limitations if a plaintiff attempts to toll the statute, or delay triggering the statute, by claiming they [sic] were

unaware of an injury at the time it occurred. The District makes no such claim here.").

**49.** *Id.* at 4.

**50.** Pl. Mem. at 15. *See also id.* at 4 ("[E]ven for MTBE releases that occurred prior to May 6, 2000, the District could not have sued for damages from such releases until the releases caused 'appreciable harm' to the District at each location where such a release occurred.").

**51.** Thus, in defining appreciable harm, OCWD draws a distinction between contamination of the shallow and deep aquifers. *See* Declaration of Roy Herndon, OCWD Chief Hydrogeologist, in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Herndon Decl.") ¶¶ 3–5 ("[T]he groundwater in the District's service area occurs in multiple aquifers. . . . While the District is concerned with all groundwater in its service area, the deeper aquifers are particularly important to the District because virtually all drinking water wells in the District [is] produce[d] from [the] deeper aquifers. . . .").

**52.** Pl. Mem. at 15.

ter supply wells in the District's groundwater resources,"[53] and by "expending funds necessary to investigate, clean up, abate, and/or remediate" the alleged contamination.[54] While defendants deny that these are injuries as a matter of law, they argue that these are exactly the kinds of injuries that OCWD alleges it has suffered—prior to May 6, 2000—from the "over four hundred confirmed MTBE release sites in the District contaminating and threatening the water supplies...."[55]

While defendants' argument is well taken, it does not resolve the question of whether OCWD suffered appreciable harm from these releases. The issue is not so much to what extent a plaintiff "may be aware of wrongdoing before damage arises,"[56] but when the wrongful act causes appreciable harm—*i.e.* an injury. Each alleged release has the potential to contaminate the groundwater, and each detection indicates the presence of MTBE, but whether OCWD has suffered an injury turns on whether such contamination caused or should have caused OCWD to act in furtherance of its "charge[ ][of] protecting all groundwater within the District's territory."[57] Thus, where MTBE was present at low levels or located in areas that did not, at that time, threaten the groundwater, OCWD suffered no appreciable harm. If, on the other hand, the MTBE detected in the groundwater was such that OCWD took, or should have taken, steps to "investigate, clean up, abate, and/or remediate" the alleged contamination,[58] claims relating to those releases are time-barred. Thus, OCWD's claims arising from releases which occurred prior to May 6, 2000 are time-barred if, before that date, they resulted in contamination at a level in response to which OCWD took, or should have taken, affirmative steps. While this holding is easily applied to those instances where OCWD acted, it is not so easily applied where OCWD did not act, but arguably should have. Because determining whether OCWD should have taken steps to respond to particular releases is a fact intensive inquiry, it cannot be resolved by summary judgment at this time.[59]

## D. Releases Occurring Prior to May 6, 2000 Resulting in Appreciable Harm After May 6, 2000

It may well be the case that some releases which occurred prior to the limitations date did not actually contaminate the groundwater—and therefore cause appreciable harm—until long after the initial release. Indeed, in response to Unocal's summary judgment motion,[60] OCWD suggests this very scenario by noting that

---

53. Compl. ¶ 5.

54. *Id.* ¶ 4.

55. *Id.* ¶ 5.

56. *San Francisco Unif. Sch. Dist.,* 37 Cal. App.4th at 1333, 44 Cal.Rptr.2d 305.

57. Def. Mem. at 4 (quoting 12/16/05 Letter from Axline to the Court, at 2–3).

58. Compl. ¶ 5. If the releases caused appreciable harm, then it is of no moment that the contamination may later cause even greater injury:

Where an injury, although slight, is sustained ... the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later time.
*Nodine v. Shiley, Inc.,* 240 F.3d 1149, 1153 (9th Cir.2001).

59. Moreover, resolution of the issue of which claims are time-barred will be substantially furthered through additional motion practice aimed at requiring OCWD to define with greater specificity what level of contamination it claims constitutes appreciable harm—*i.e.,* what level of contamination should reasonably have caused it to take responsive action.

60. *See* Joinder of Unocal Corporation and Union Oil Company of California in Defendants'

regardless of when a release occurs "the speed at which contamination spreads following a release" depends on a variety of factors.[61]

Thus, although the releases from the Unocal station occurred prior to the limitations date, OCWD asserts that it did not suffer appreciable harm as a result of those releases until after the limitations date.[62] OCWD's position is unclear. OCWD could be arguing that it did not suffer appreciable harm until after the limitations date because the plume did not reach the groundwater until then, or its argument could be that the level of MTBE present was not sufficiently high to constitute contamination.[63] The first argument is untenable, however, because there was no prolonged lapse between the release and its presence in the groundwater.[64] The only issue, then, is when did the MTBE in the groundwater cause appreciable harm. There may be other instances, however, where due to the particular subsurface characteristics at a release site, MTBE-containing gasoline spilled prior to the limitations date did not even reach the groundwater until after the limitations date.

Plaintiff may submit supplemental briefing on the following issue: whether any releases that occurred prior to May 6, 2000 did not result in appreciable harm until after that date, either because the level of MTBE present in the groundwater had not yet caused an injury or because the release had not yet reached the groundwater.

### E. Applicability of the Discovery Rule

■ Because OCWD argues that some releases that occurred prior to May 6, 2000, had not caused any appreciable harm by that date, it disclaims any reliance on the discovery rule to toll the limitations period. This Court has now determined that OCWD suffered appreciable injury when a release at a particular site caused OCWD to act, or reasonably should have caused it to act, in response to the contamination caused by the release. Nevertheless, the statute may be tolled if the harm suffered was not reasonably discoverable at the time. This may have occurred under two scenarios. *First,* OCWD may not have been aware that a particular release had reached the groundwater. *Second,* although OCWD may have been aware of the presence of MTBE in the groundwater, it may not have apprehended the harm at that time. In either scenario, this lack of knowledge—if reasonable—may toll the limitations period.

---

Motion for Summary Judgment Based on the Statute of Limitations ("Unocal Def. Mem"). Unocal asserts that because it sold its relevant gasoline operations in 1997, and thereafter did not engage in any of the activities alleged by OCWD, any claims against it must have accrued prior to the limitations date and are now time-barred.

**61.** Plaintiff's Opposition to Unocal Def. Mem. ("Pl.Opp.Unocal") at 2.

**62.** *See id.*

**63.** *Id.* (citing Komex Site Summary, Ex. 1 to Declaration of Michael Axline in Support of Pl. Opp. Unocal ("Komex Sum.")). For example, OCWD notes that although releases

were reported at a Unocal station in 1996, recent sampling data from 2005 shows that "[s]ignificant concentrations of MTBE ... and particularly TBA ... were recently detected" in a nearby well. *Id.* (quoting Komex Sum. at 3).

**64.** The Komex Site Summary indicates that "MTBE was released at the Site prior to 1996 and can be traced from the source area to groundwater beneath the Site. Once MTBE reached the groundwater it spread laterally, particularly to the south and west." Komex Sum. at 4. Further, the report notes that MTBE was detected in "groundwater samples in August of 1996" in a well next to that which OCWD described as having been recently impacted. *Id.* at 3.

Certainly, many of OCWD's public statements from the late 1990s reflect a belief that releases that resulted in the presence of MTBE in the groundwater had not yet harmed the groundwater:

> Although MTBE is a *future* threat to groundwater supplies, most Orange County Water District wells are protected by underground clay layers that cover much of the Orange County's vast groundwater basin. The clay layers retard petroleum leakage containing MTBE in near-surface, or perched aquifers. This restricts its movement into the deeper, drinking water aquifers.[65]

OCWD's internal documents appear to express views consistent with its public statements that MTBE contamination posed a potential for injury, but as its presence was mostly limited to low level detection in the shallow aquifers, it had not yet caused any appreciable harm.[66]

Although OCWD disclaims any reliance on the discovery rule to toll the limitations period, it points to various factors which suggest just such an argument. For example, in discussing a number of pre-May 6, 2000 detections, OCWD emphasizes that testing showed only low levels of contamination which it believed, at that time, to be below MTBE's taste and odor threshold.[67] These thresholds are only relevant to the extent that OCWD might yet argue that it would have been reasonable to believe that it had suffered no appreciable harm from low level contamination that did not harm or threaten to harm the groundwater in the district.

With respect to releases occurring prior to May 6, 2000, OCWD must now identify, in supplemental briefing, those releases that it claims caused no appreciable harm, as defined in this Opinion, prior to that date. Or, if it elects to do so, it might now assert tolling based on its *reasonable belief* that it had not suffered appreciable harm prior to that date even though such harm occurred.

### F. Releases Occurring After May 6, 2000

■ OCWD also argues that numerous releases of gasoline containing MTBE have occurred subsequent to May 6, 2000.[68]

65. 6/30/98 Letter from Mills to Orange County Register, Ex. 12 to Axline Decl. *See also* 9/10/98 Letter from Kathryn Barr, OCWD Board Member, to Water Users, Ex. 3 to Declaration of Michael Heartney in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Heartney Decl."), at 10 ("It is important to immediately protect our deeper, drinking water aquifers from MTBE contamination. We can do this by . . . cleaning up existing MTBE contaminated groundwater.").

66. *See, e.g.*, 4/19/00 Email from Yamachika to Mills, Ex. 15 to Axline Decl. (discussing scattered MTBE detections and stating, "Our basin is still doing fine with respect to MTBE"); Draft Comments on News Release: Orange County Water District Board Adopts Resolution to Ban MTBE (Sept. 29, 1998), Ex. 8 to Sartoris Decl., at 14 ("There is quite a bit of MTBE in the shallower non-potable aquifers throughout OC (and this could spread) and that is one reason we are interested in keeping an eye on the compound . . . ."); 8/12/98 Memorandum from Mills to OCWD Board of Directors, Ex. 3 to Heartney Decl., at 5 ("MTBE continues to be a growing threat to Orange County's groundwater basin."). *See also* 1/16/06 Deposition of Roy Herndon, Ex. 6 to Axline Decl., at 704 ("My understanding of that time frame was that the district felt that it [MTBE] may be a *future* threat to drinking water supplies") (emphasis added); *id.* at 716 ("My recollection is that prior to 2000, our sense was that it [MTBE] was in the shallow aquifer and had not impacted drinking water wells.").

67. *See, e.g.*, Herndon Decl. ("None of the MTBE detections in any of the City of Anaheim wells between 1995 and 1998 exceeded the then-known taste and odor thresholds for MTBE (15 ppb to 45 ppb).").

68. *See* Pl. Mem. at 5.

Specifically, OCWD notes that after May 6, 2000, there "have been over one hundred reported releases" from USTs located within the district.[69] Many of these releases, OCWD contends, are within close proximity to drinking water wells, some of which have had MTBE detections in the last year.[70] Additionally, OCWD states that in 2001 MTBE was, for the first time, detected in the Santa Ana River, the river from which it draws groundwater in the basin.[71]

In response, defendants dispute the sufficiency and accuracy of OCWD's facts. For example, as to the new release sites from USTs, defendants argue that the database from which OCWD collected its information is "too incomplete to permit" a reliable determination,[72] such conclusions are based on insufficient facts,[73] and that any releases that have occurred are not as near to wells as OCWD has stated in its affidavits.[74] Further, defendants note that for one release site, MTBE-blended gasoline was no longer being delivered to that station.[75] Additionally, defendants argue that at least some of these purportedly new release sites had actually been contaminated prior to May 6, 2000.[76] Similarly, defendants point to evidence showing that MTBE had already been detected in the Santa Ana River at various points prior to May 6, 2000.[77]

The existence and extent of new releases from USTs after May 6, 2000, is a question of fact on which the parties clearly disagree. Although it is true, as defendants argue, that Herndon's discussion of new releases is largely unsupported by reference to specific release locations, he does point to specific wells that OCWD alleges have been newly contaminated.[78] This, coupled with the Corrective Action Letters from the Orange County Health Care Agency, which show the existence of at least some releases after May 6, 2000, is sufficient to raise a triable issue of fact as to the existence of new releases.[79] As such, this matter cannot be resolved on summary judgment. If plaintiff can show that post-May 2000 releases occurred, and those releases resulted in harm to OCWD, claims relating to contamination from those releases are timely because they relate to conduct and harm occurring within three years of the filing of the Complaint.

However, as to two specific points of contamination—the Edinger Avenue Chevron Station and the Santa Ana River—which OCWD alleges occurred after May

**69.** *Id.* (citing various post-May 2000 Orange County Health Care Agency Release Reports/Corrective Action Letters, Ex. 32 to Axline Decl.).

**70.** *See* Pl. 56.1 ¶ 32 (citing Herndon Decl. ¶ 6).

**71.** *See* Pl. Mem. at 10.

**72.** Def. Mem. at 8 (citing Declaration of Margaret Eggers, defendants' expert, in Support of Defendants' Motion for Summary Judgment Based on the Statute of Limitations ("Eggers Decl.") ¶¶ 14–15).

**73.** *See id.*

**74.** *See id.* (citing Eggers Decl. ¶ 14).

**75.** *See* Heartney Decl. ¶ 5 (stating that by February 17, 2003 "MTBE had been removed from ARCO-brand gasoline distributed in California"). *See also* Def. Rep. 56.1 ¶ 33.

**76.** *See* Def. Rep. Mem. at 8 (citing Heartney Decl. ¶ 6).

**77.** *See* OCWD, Detection of MTBE at Large and Small Water System Wells, January 1997 to June 1998, Ex. 10 to Sartoris Decl. *See also* Fitzsimmons Dep., Ex. 4 to Heartney Decl., at 260–61 (discussing prior detections of MTBE).

**78.** *See* Herndon Decl. ¶ 6.

**79.** *See* Orange County Health Care Agency Release Reports/Corrective Action Letters, Ex. 32 to Axline Decl.

6, 2000, the defendants have established that OCWD suffered an injury prior to the limitations date.[80] As such, the claims relating to these specific contaminations are time-barred unless plaintiff can show that the limitations period is tolled by the discovery rule.[81]

Finally, defendants have shown that MTBE could not have been a component of the gasoline spilled at an Orange County ARCO station on February 17, 2003, because the MTBE-blended gasoline was no longer being supplied to that station as of that date.[82] As such, there can be no claim for MTBE contamination as a result of this release.

## IV. CONCLUSION

For the reasons set forth above, defendants' motion is denied as to claims arising from releases which occurred after May 6, 2000. Defendants' motion is granted as to claims arising from releases which occurred prior to May 6, 2000, where OCWD acted in response to an MTBE contamination. With respect to releases that occurred prior to May 6, 2000, OCWD may submit additional briefing no later than thirty (30) days from the date of this Opinion and Order on the following issues: (1)

which of those releases did not result in appreciable harm before May 6, 2000, either because the MTBE did not reach the groundwater or because MTBE was not detected at a level that required, or should have required, OCWD to take action; and (2) whether the statute of limitations should be tolled based on the discovery rule. Defendants may respond within thirty (30) days thereafter and plaintiff may reply within fifteen (15) days after receipt of defendants' response.

SO ORDERED.

80. *See* Heartney Decl. ¶ 6 (discussing prior contamination at the Edinger Avenue Chevron Station); Def. Rep. 56.1 ¶ 35 (discussing prior contamination in the Santa Ana River).

81. Although OCWD claims that its injuries do not arise from pre-May 2000 contamination, it does argue that if contamination is present both before and after the limitations date, any claims remain timely because of the continuing tort doctrine. *See* Pl. Mem. at 7. This argument fails because California's continuing tort doctrine only applies to claims of continuing nuisance and continuing trespass, which defendants do not challenge in this motion. *See, e.g., Wilshire,* 20 Cal.App.4th at 732, 24 Cal.Rptr.2d 562 (holding product liability and negligence claims relating to gasoline contamination time-barred, but allowing claim for continuing nuisance); *Mangini v.*

*Aerojet–General Corp.,* 230 Cal.App.3d 1125, 281 Cal.Rptr. 827 (Cal.Ct.App.1991) (holding claims for products liability, negligence, permanent nuisance and permanent trespass untimely, but allowing claim for continuing nuisance and continuing trespass).

82. The spill, which occurred *during a gasoline delivery* to the station, occurred one month after defendants had stopped distributing gasoline containing MTBE. *See* Heartney Decl. ¶ 5 (stating that by February 17, 2003 "MTBE had been removed from ARCO-brand gasoline distributed in California" (citing Declaration of Erik Alson, Atlantic Richfield employee, Ex. 2 to Heartney Decl.)). *See also* Def. 56.1 ¶ 33. Plaintiff offers no evidence to suggest that gasoline delivered on February 17, 2003 contained MTBE.